587 So.2d 116 (1991)
Jeanne Hurtle PULLEY, Defendant-In-Rule/Appellee,
v.
Thomas Lamar PULLEY, Sr., Plaintiff-In-Rule/Appellant.
No. 22722-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1991.
*117 Sutton & Sutton by Bobby D. Sutton, Jr., Shreveport, for plaintiff-in-rule, appellant.
Sockrider, Bolin & Anglin by H.F. Sockrider, Jr., Shreveport, for defendant-in-rule, appellee.
Before SEXTON, BROWN and STEWART, JJ.
SEXTON, Judge.
Appellant Thomas Pulley, Sr. appeals the judgment of the district court holding him in contempt of court, as well as its denial of his petition to modify the joint custody of his minor son from his former marriage to name him as the new domiciliary parent. We reverse and remand.
The parties were married on June 11, 1981. The child, Thomas Pulley, Jr., was born on January 30, 1983. The parties were judicially separated on November 13, 1986, on the grounds of mutual fault. Mr. Pulley was granted a final divorce by default on September 10, 1987.
Prior to the final divorce, Mr. Pulley filed a petition on February 9, 1987, seeking to have his former wife (now Mrs. Brewster) held in contempt of court, and also seeking court costs and attorney fees. (The allegations of this and two subsequent petitions for contempt by Mr. Pulley against Mrs. Brewster are summarized in an appendix hereto.)
On September 8, 1988, Mr. Pulley filed another petition to have his ex-wife held in contempt, alleging that she had removed the child from Bossier Parish without court authorization, in violation of the joint custody plan.
Mr. Pulley filed another petition to have his ex-wife held in contempt on May 2, 1989, this time asking also that the domiciliary custody of the child be transferred to him. (See appendix). Although a hearing on this rule was originally scheduled for May 11, Mr. Pulley's ex-wife sought and was granted continuances until July 27, 1989.
At the July 27 hearing, the district court ordered that the child be transferred to Mr. Pulley immediately after the hearing to offset his having been denied visitation since April of that year. Mr. Pulley was to *118 have the child until two days before school was to start in August, with his ex-wife given one specified weekend of visitation for the purpose of procuring school supplies. Thereafter, Mr. Pulley was to be permitted specific, scheduled visitation to remedy the visitation problems which had plagued the joint custody plan. The district court finally ordered the parties to resolve their differences with the assistance of a court-appointed mediator.
On December 4, 1989, Mr. Pulley filed another petition to have his ex-wife held in contempt of court. (See appendix). Finally, on January 11, 1990, Mr. Pulley filed the last in this series of petitions to have his ex-wife held in contempt of court, alleging that she had failed to show up for the transfer of the child to him for his visitation weekend of Friday, January 5, 1990, through Sunday, January 7, 1990. He further alleged that she refused, through the child, to speak to him when he called to inquire into her failure to appear for the transfer.
On February 8, 1990, a hearing was held in the district court regarding all of these petitions. At the conclusion of the hearing, the district court entered an interim order regarding visitation and noted that a decision on the merits of the contempt and domiciliary custody matters would be rendered in August of that year.
However, at that time the court made several observations regarding the case and the parties, including that this was one of the most bizarre cases the court had ever seen, that Mrs. Brewster's credibility was "zero" due to the changes in her stories when confronted with the existence of a potential witness or item of evidence which would contradict her testimony, and that the focal point of all of the problems regarding custody and visitation centered on Mrs. Brewster's "get[ting] [her] way." The court further noted its disgust over Mrs. Brewster's administration of a "mohawk" haircut to her son out of spite for Mr. Pulley.
The court lamented that the written record could not record Mrs. Brewster's "facial expression, the cold stare in [her] eyes and the coldness in [her] heart when [she] testified. And that's a shame because somebody ought to see how bitter [she is]."
The court further decried her inability to explain why she unilaterally terminated Mr. Pulley's visitation starting in April 1989 or why she was too "busy" to speak with Mr. Pulley regarding her failure to appear for the transfer of the child for Mr. Pulley's weekend of visitation in January 1990.
The district court left the child in Mrs. Brewster's custody, but granted Mr. Pulley visitation every weekend until the conclusion of the school year. At the beginning of the summer vacation, Mr. Pulley was to have full custody of the child until final determination of the issues later in the year.
On September 7, 1990, the matter was called for a final ruling on the merits. The court found both Mrs. Brewster and Mr. Pulley to be in contempt of court and ordered that they each serve 60 days in jail. However, the jail sentences were suspended on the condition that the parties each comply fully with all orders of the court and conduct themselves in the manner that was in the best interest of the child.
The court further warned the parents that recurrences of the egregious behavior on their part could result in custody of the child being transferred to a third party or agency. The court opined that the actions of Mrs. Brewster were more contemptuous than those of Mr. Pulley and, further, that, in its opinion, Mrs. Brewster's administration of a "mohawk" haircut to the child "borders on child abuse." That one incident, the court noted, could have caused it to consider granting custody to Mr. Pulley, but for the fact that the child had been otherwise cared for in her custody. In addition, the district court opined that a child of this age is in need of care which can most effectively be provided by his mother.
Finally, the court concluded that the mediation agreement previously agreed to *119 by the parties was in the best interest of the child and ordered it implemented.
Mr. Pulley appeals both the district court's holding him in contempt and its refusal to modify the joint custody arrangement to name him as the domiciliary parent.
In his first assignment of error, Mr. Pulley complains that the district court held him in contempt of court, despite that no rule to show cause was ever issued by Mrs. Brewster or by the district court. Mrs. Brewster neither argued against this issue, nor did she brief it.
Except as otherwise provided by law, a person charged with committing a constructive contempt of court may be found guilty thereof and punished therefor only after the trial by the judge of a rule against him to show cause why he should not be adjudged guilty of contempt and punished accordingly. LSA-C.C.P. Art. 225 A. A hearing to impose sanctions necessarily requires proper notice. Billiot v. Sea Life, Inc., 384 So.2d 1023 (La.App. 4th Cir.1980).
Because the instant record fails to contain any evidence that Mr. Pulley was put on notice that he had to show cause why he should not be held in contempt of court, this aspect of the district court judgment must be reversed.
In his second assignment of error, Mr. Pulley argues that the district court abused its discretion in not modifying the joint custody plan to name him as the domiciliary parent. Mrs. Brewster argues that the district court was well within its discretion in leaving the domiciliary custody as it was, with the visitation modifications previously implemented, in order to give the parties one last opportunity to work things out in the best interest of the child.
In all cases involving change of custody after an original award, permanent custody of the child shall be granted to the parents in accordance with LSA-C.C. Art. 131. LSA-C.C. Art. 134. Any order for joint custody may be modified if it is shown that the best interest of the child requires modification or termination of the order. LSA-C.C. Art. 131 E.
When a trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change in environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).
Where, however, no evidence was adduced at the district court level prior to the entry of the joint custody order which is sought to be modified, that joint custody decree is not a "considered decree" within the meaning of Bergeron. McGee v. McGee, 552 So.2d 576 (La.App. 2d Cir.1989); Bailey v. Bailey, 527 So.2d 1030 (La.App. 2d Cir.1988), writ denied, 528 So.2d 565 (La.1988); Foy v. Foy, 505 So.2d 850 (La. App. 2d Cir.1987); Dungan v. Dungan, 499 So.2d 149 (La.App. 2d Cir.1986). In that situation a party seeking to modify the joint custody arrangement must still prove a change in circumstances since the original decree, but the heavy burden of proof requirement is not applicable. Meredith v. Meredith, 521 So.2d 793 (La.App. 2d Cir. 1988); Foy v. Foy, supra.
In the instant case, the original joint custody plan was entered by the consent of the parties. It was therefore not a "considered decree," and the "heavy" burden of proof required by Bergeron is not applicable. Accordingly, the appellant was required to prove only that there had been a material change in circumstances since the entry of the original decree and that the modification which he proposed was in the best interest of the child.
The district court concluded that it was in the best interest of the child to leave him in Mrs. Brewster's domiciliary custody, despite that it found her to have "zero" credibility, that all problems between the parties arose when Mrs. Brewster did not "get her way," that Mrs. Brewster gave the child a *120 mohawk haircut out of spite (which the court found to border on child abuse), that she was cold and bitter, that her conduct was more contemptuous than that of Mr. Pulley, and that she was unable to explain why she unilaterally terminated Mr. Pulley's visitation privileges between April 1989 and the end of July 1989, at which time the district court ordered her to immediately surrender custody of the child to Mr. Pulley for him to have visitation until the end of the summer.
A district court's award of custody is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. Schelldorf v. Schelldorf, 568 So.2d 168 (La.App. 2d Cir. 1990).
We are at a loss to understand how the district court could have found it to be in the child's best interest to remain in the custody of his mother when an extraordinary amount of her energy clearly appears to have been devoted to obstructing the relationship between the child and his father. She seized virtually every opportunity to deny Mr. Pulley his court-ordered visitation privileges or to make the exercise of those privileges inconvenient or frustrating. She or her family members repeatedly made it difficult or impossible for Mr. Pulley to speak with his child. Although he was able to speak with Mrs. Brewster more often than he was permitted to speak with his child, those contacts were rarely productive. The worst that the district court could conclude about Mr. Pulley was that he had used profane language toward his ex-wife.
It is apparent to this court that, based on the evidence contained in this record, it is in the best interest of the child that he be placed in the domiciliary custody of Mr. Pulley. All of the evidence indicates that, all other factors being equal, Mr. Pulley is much more willing and able to facilitate and encourage a close and continuing parent-child relationship between his son and the boy's mother; there is no evidence that Mrs. Brewster would be willing to make a corresponding effort for Mr. Pulley's benefit. See LSA-C.C. Art. 131 C(2)(j).
As an illustration of our conclusion regarding this factor, we note that the evidence shows that Mr. Pulley purchased a birthday card for his son to give to Mrs. Brewster and drove from Bossier City to Minden, where he left it in the Brewster's mailbox. Upon his return to Bossier City, Mr. Pulley called his son to advise him of the situation so that the boy could retrieve the card from the mailbox and personally deliver it to his mother. When the Brewsters became aware of the situation, Mr. Brewster called Mr. Pulley to admonish him, using profane language and telling him that he had no business placing something in their mailbox.
Besides the evidence of animosity and hostility, we note that not all other factors are equal. There is ample evidence that Mr. Pulley involves his son in family and extracurricular activities, something which is conspicuously absent from Mrs. Brewster's evidence.
In addition to our conclusion that it is in the child's best interest to be in his father's domiciliary custody, we also find that Mrs. Brewster's continuing efforts to interfere with the parent-child relationship between Mr. Pulley and his son constitute a material change in circumstances arising after the original custody decree and is one which justifies the modification.
In conclusion, we hold that the district court erred when it held Mr. Pulley in contempt of court where he had no notice that he had to defend against such a charge. We also hold that the district court abused its discretion in allowing the child to remain in the domiciliary custody of Mrs. Brewster. We reverse and place domiciliary custody of the child with Mr. Pulley, maintaining joint custody. We remand this matter to the district court to reformulate the joint custody plan to provide for reasonable visitation privileges for Mrs. Brewster.
REVERSED AND REMANDED.

APPENDIX
The petition of February 9, 1987 alleged:

*121 that, on three occasions, his wife had arrived 30 to 45 minutes late to transfer the child to him for his weekend visitation;
that his wife limited him to two and one-half hours visitation, in her presence, at Christmas in 1986 rather than the four days provided in the joint custody plan implemented at the time of their separation;
that his wife or her immediate relatives would hang up each time he called, thus preventing him from speaking with the child;
that his wife denied him visitation with his child on the weekend of Friday, January 2, 1987;
that on two separate occasions his wife's brother refused to permit him to speak with his son, verbally abusing Mr. Pulley on one occasion and hanging up on the other;
that on Friday, January 30, 1987, his wife failed to show up for the transfer of the child; when he later reached her by phone, she claimed the child was sick and running a fever and unable to visit with his father that weekend;
that his wife refused his offer to take the child to the doctor, procure medication for him, or to speak with the child;
that at 11:30 a.m. on Saturday, January 31, 1987, when he called his wife to inquire into his son's condition, he was told by her brother that the boy and his mother were asleep, then the brother hung up;
that on Sunday, February 1, 1987, Mr. Pulley again called his wife to ask about his son and that her father answered the phone and hung up on him;
that also on Sunday, February 1, 1987, Mr. Pulley called the boy's doctor to inquire into his condition and was advised that his wife had neither called the doctor, nor had she taken the child in to see him;
that on Monday or Tuesday, February 2 or 3, 1987, Mr. Pulley called his wife to inquire into his son's condition and was disconnected, once by each of his wife's parents; and
that he had not been permitted to see or speak to his son since Sunday, January 18, 1987.
The petition of May 2, 1989 alleged:
that his ex-wife had consistently refused to permit him his alternating weekend visitation, contrary to the joint custody plan;
that his ex-wife refused to allow the child to telephone him and that she would not permit Mr. Pulley to speak to the child when he called;
that his ex-wife had instructed the boy's school not to allow Mr. Pulley to have contact with the child at school for lunch or other special occasions or to allow him to bring snacks to his son's school for special occasions;
once again, that his ex-wife had removed the child from Bossier Parish without court authorization or even discussing it with Mr. Pulley; and
that his ex-wife was restricting contact between him and the child as much as possible.
The petition of December 4, 1989 alleged:
that on the afternoon of the July 27, 1989, hearing wherein she was ordered to immediately transfer custody of the child to Mr. Pulley, she gave the child a "mohawk" haircut before transferring him to his father; and
that she refused to sign the mediation agreement negotiated following the July 27 hearing, despite that it had been finalized since August of that year.