606 So.2d 862 (1992)
Mark Warren ODOM, Appellee,
v.
Katherine Leigh ODOM, Appellant.
No. 23992-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1992.
Stay Order Vacated; Writ Denied November 6, 1992.
*863 Wiener, Weiss, Madison & Howell by Katherine Clark Hennessey, Shreveport, for appellant.
Steven G. Bresler, Shreveport, for appellee.
Before SEXTON, LINDSAY and BROWN, JJ.
LINDSAY, Judge.
The plaintiff-in-rule, Katherine Leigh Odom, appeals from a trial court judgment denying her request for change of custody and granting her former husband, Mark W. Odom, continuing custody of their two minor children. For the reasons assigned below, we reverse and remand.

FACTS
The parties were first married in 1981 and divorced in 1982. After their divorce, Mrs. Odom married Christopher Tully. After *864 separating from Mr. Tully, Mr. and Mrs. Odom remarried in August, 1987. Of this remarriage, two children were born: Gary (birthdateJanuary 25, 1988), and Miranda (birthdateSeptember 4, 1989).
On April 4, 1990, Mrs. Odom left the matrimonial domicile in Logansport, taking the children with her. They entered a shelter run by the YWCA Family Violence Program in Shreveport. Witnesses who saw Mrs. Odom upon her entry to the shelter observed that she had a black eye and was bruised and battered. Eight-month-old Miranda also had a bruise on her head; Mrs. Odom informed the social workers at the shelter that, while trying to hit her, Mr. Odom had struck the child.
On April 19, 1990, Mr. Odom filed a petition for separation, alleging abandonment and cruel treatment by Mrs. Odom. He also sought custody of the children. On May 2, 1990, Mrs. Odom answered and reconvened, alleging physical and mental abuse by Mr. Odom, as well as constructive abandonment. She sought a legal separation, custody and child support. Mr. Odom filed a general denial to the reconventional demand. Thereafter, he also filed a peremptory exception of no cause of action to his wife's reconventional demand, asserting that Mrs. Odom had never been divorced from her second husband, Mr. Tully, thus invalidating her remarriage to Mr. Odom.
On May 22, 1990, Mrs. Odom was granted temporary custody of the children with specific visitation rights being awarded to Mr. Odom. The parties were also ordered to attempt mediation. However, the mediator later informed the court that it was unsuccessful due to Mr. Odom's negative attitude.
On August 17, 1990, Mr. Odom filed a motion in which he asserted that Mrs. Odom was abusing Gary. He stated that although he had caused the children to be placed in foster care pending their examination by a physician, the children were returned to Mrs. Odom when their examination by a physician revealed no abuse. Mr. Odom asked that the children again be placed in foster care pending the determination of custody. He also asserted that Mrs. Odom was likely to flee the jurisdiction of the court. The motion was initially granted. However, it was rescinded on August 27, 1990, on the motion of the Department of Social Services, which found no evidence of any abuse. At the end of August, 1990, Mrs. Odom fled Louisiana with the children.
Mr. Odom later amended his petition to seek an annulment of his marriage to Mrs. Odom based upon her prior undissolved marriage. He also filed another motion on October 23, 1990, again seeking to have the children placed in foster care.
On October 29, 1990, on motion of Mr. Odom, the trial court appointed a curator ad hoc to represent Mrs. Odom, whose whereabouts were unknown. On November 20, 1990, a hearing was held at which the curator represented Mrs. Odom. The court minutes stated that the matter had been fixed for trial as "an uncontested proceeding" with the agreement of the curator ad hoc. Using standard language, the court minutes further stated that "[t]hereupon, case tried, evidence adduced and closed, and Judgment for Plaintiff, as prayed for, see Decree." The preamble to the judgment stated that the "matter came on for trial," and that "[t]he law and evidence being in favor thereof, and for reasons this day orally assigned ...," sole custody of the children was granted to Mr. Odom and the marriage was annulled. (No transcript of this proceeding is found in the appellate record.)
On December 20, 1990, Mr. Odom filed a petition to hold Mrs. Odom in contempt of court for her failure to return the children. By this time, Mr. Odom had determined that she and the children were receiving welfare assistance in Missouri where they were living in a shelter.
On January 23, 1991, Mrs. Odom filed a petition to change custody. She alleged several specific instances of physical abuse against her by Mr. Odom. She also alleged that on June 23, 1990, Mr. Odom attacked her roommate while she was holding Miranda. She asserted that she fled the state because of reliable information that Mr. Odom was planning to kidnap the children.
*865 On or about June 21, 1991, Mr. Odom obtained physical custody of the children. On July 22, 1991, Mrs. Odom filed a rule for contempt, asserting that Mr. Odom had refused to allow her to see the children for the past month.
On August 14, 1991, a hearing was held on the rule to change custody. The parties stipulatedand the trial court agreed that joint custody was not in the best interest of the children. Witnesses presented by Mrs. Odom included social workers who had seen her battered and bruised condition when she entered the family violence shelter the day she left her husband. Witnesses for Mr. Odom included his mother and his pastor.
At the conclusion of the evidence, the trial court found that neither party was psychologically unfit to have custody. Based upon the home studies ordered by the court, it also found that both parents could provide a suitable physical environment. The court characterized both parents as "shakey [sic], emotionally," noting that in the opinion of the psychiatrist appointed to examine the parties any problems they had were intertwined with the court proceedings. The court stated its belief that the relationship between the parents was so hostile that an award of sole custody to either one would effectively terminate the other's parental rights.
The trial court ruled that the best interest of the children required that the prior award of sole custody to Mr. Odom be continued, but it granted "reasonable visitation" to Mrs. Odom. (However, it declined to establish any specific visitation schedule.) Mrs. Odom's contempt rule against Mr. Odom for failure to allow visitation was denied because the original judgment did not provide for her visitation rights. Costs were assessed against Mrs. Odom.
Mrs. Odom appeals, asserting that the trial court applied the wrong burden of proof and that it erred in finding that sole custody by the father was in the best interest of the children.

LAW
Custody of children after divorce is regulated by LSA-C.C. Art. 134 and, by reference, Art. 131. The paramount consideration in a change of custody case is always the best interest of the children. LSA-C.C. Art. 131(E); McGee v. McGee, 552 So.2d 576 (La.App. 2d Cir.1989).
When a trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the children as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change in environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Pulley v. Pulley, 587 So.2d 116 (La.App. 2d Cir.1991).
A considered decree is one for which evidence as to parental fitness to exercise custody is received by the court. By contrast, a judgment with a custody plan that was entered by default, was not contested or was entered merely by the consent of the parties is not a considered decree. Norris v. Norris, 604 So.2d 107 (La.App. 2d Cir.1992).
If the record is silent as to whether the issue of custody has previously been litigated, the courts presume that the prior decree was uncontested and thus not a "considered" decree. The party alleging applicability of the Bergeron rule must show, through introduction of the transcript of the prior proceeding or otherwise, that the custody issue was previously "considered." Stevens v. Stevens, 340 So.2d 584 (La.App. 1st Cir.1976); Moore v. Moore, 544 So.2d 479 (La.App. 2d Cir.1989).
If no considered decree has been rendered, the heavy burden of proof of Bergeron does not apply, but the party seeking a change of custody must show a change in circumstances and that the new custody arrangement would be in the children's best interest. Myers v. Myers, 561 So.2d 875 (La.App. 2d Cir.1990).
*866 A trial court's award of custody is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. Pulley, supra.
Joint custody is presumed to be in the best interest of the children. LSA-C.C. Art. 131(C). However, the parents in the present case have stipulated that joint custody would not be in the best interest of Gary and Miranda.

UNCONTESTED DECREE
Mrs. Odom contends that the trial court clearly erred in finding that sole custody to Mr. Odom was in the children's best interest. She argues that the custody decree obtained while she was in Missouri was not a considered decree. Thus, her burden of proof at the hearing to change custody was the best interest of the children, not the heavy burden of proof in Bergeron, supra. Mrs. Odom states that Mr. Odom's testimony made it clear that he would not allow the children to have any contact with her. On the other hand, she insists that she would encourage their relationship with their father if she had custody. She also maintains that Mr. Odom's pattern of abuse against her and his family's attitude toward her demonstrate that his sole custody of the children could not be in their best interest.
Mr. Odom argues that even though the prior custody award was "uncontested," it was not a "consent" judgment. Thus, he contends that the heavy Bergeron burden of proof was applicable.
Mr. Odom also contends that it was Mrs. Odom's responsibility as the appellant to designate those parts of the record that supported her position. Thus, the lack of a transcript of the November 1990 hearing should preclude her from asserting that the prior custody award was not a "considered" decree. We disagree. As previously stated, the party who desires application of the Bergeron standard has the burden of proving that the prior custody award was a "considered" decree. Stevens, supra; Moore, supra. Apparently, Mr. Odom did not prove to the trial court's satisfaction that the prior decree was "considered" because it applied the best interest of the children standard in awarding custody.
Like the trial court, we conclude that the prior award of custody was not a considered decree. The court minutes for the prior custody decree are ambiguous and vaguely indicate that some evidence was adduced in the proceeding with the curator ad hoc. However, we note that these proceedings concerned not only custody, but also Mr. Odom's petition to have his second marriage to Mrs. Odom annulled. The record also demonstrates that the curator agreed that the matter be taken up as "uncontested."[1]
Consequently, we find that the prior decree was not a "considered" decree as contemplated by the jurisprudence. Therefore, the applicable burden of proof is the best interest of the children.

DETERMINATION OF CUSTODY
The evidence presented at the hearing on the rule to change custody showed that Mr. Odom is a self-employed accountant. He currently resides with his 58-year-old mother in a 3,000 square-foot house. However, at the time of trial, a male exchange student had just moved into the house with the family. Mr. Odom testified that when the children are not at home during the day, they are in day care. Mr. Odom began attending the Methodist church in January, 1991, and is active in such activities as choir. Previously, he belonged to a congregation of Jehovah's Witnesses but left because he was facing discipline for allegedly beating Mrs. Odom.
Mr. Odom generally denied Mrs. Odom's charges of physical abuse, but admitted slapping her once while fighting off her *867 sexual advances, as well as an altercation over an unpaid phone bill. He claimed that Mrs. Odom was "insane" and a liar. Although he claimed that she had abused Gary, he could provide no proof to substantiate these charges. He further denied Mrs. Odom's charges that he had abused the children.
Mrs. Odom testified that she was attending community college in Kansas City to earn an associate degree in business and that she planned to work towards a university bachelor degree in business. She had a two-bedroom apartment provided by the Missouri Housing Department where she and the children would live if the court granted her custody. She was still receiving AFDC aid and was a candidate to apply for certain grants. Her school schedule would be such that the children would be in day care for one-half of the day.[2]
Mrs. Odom also testified as to numerous beatings inflicted upon her by Mr. Odom during their marriage, often in the presence of the children, including the one that caused her to flee the matrimonial domicile in April, 1990. She stated that she was unsure of the status of her marriage to Christopher Tully but would try to resolve that issue after the children's custody was decided.[3] She stated that she had no contact with her family and that she did not particularly want her children to be around them.
Two social workers associated with the family violence program verified Mrs. Odom's battered condition when she entered the program in April, 1990, as well as the bruise on Miranda's head. (Mr. Odom claimed that the child was injured because of Mrs. Odom's inattention.) They both testified that Mrs. Odom took excellent care of her children while she was residing at the shelter.
One of Mr. Odom's witnesses, Sue Morris, testified that she had seen Mr. Odom almost daily and that the children appeared happy with him. Although she claimed that she had once seen Mrs. Odom jerk Gary up and hit him on the back, she had not thought the incident important enough to even report it to Mr. Odom at the time. Several friends testified that the children seemed to be well-cared for by Mr. Odom. However, these witnesses generally had no knowledge of the children's home life with Mr. Odom or the quality of their relationship with Mrs. Odom.
Mr. Odom's mother, Charlsie, denied seeing any fights between her son and daughter-in-law while they lived with her. She admitted that Mrs. Odom had taken good care of the children, but maintained that her son had always been active in their care. Although she claimed to have seen Mrs. Odom abuse the children, she admitted that she had considerable personal animosity against her.
In addition to the testimony presented at the hearing, the trial court also ordered home studies on each of the parents. We have examined these studies in some detail. Although the trial court found that they would support an award of custody to either parent, we disagree.
Mrs. Odom's home study was very complimentary. The social worker found her to be cooperative and open. Due to Mr. Odom's allegations of child abuse, the agency had had prior dealings with Mrs. Odom and had always found her to be cooperative. Furthermore, investigation had found these allegations against her to be untrue. Although upset by her separation from her children, Mrs. Odom understood the need to work out custody through the court system. The social worker compiling the report found that she *868 could make an "excellent home" for her children, was totally dedicated to her children, and had shown great strength in dealing with a stressful situation.
However, we are at a loss to understand how the trial court could characterize Mr. Odom's home study as being favorable. Although the social worker stated that she did not doubt "Mr. Odom's sincere desire to be a good father and a good person," she evaluated him as being "a controlling person" who becomes "disturbed" by his inability to control the people in his life. The social worker further believed that he had "the potential for violence, but this would most likely be limited to domestic violence, as his position in the community seems important to him." When initially contacted for the home study, Mr. Odom was extremely belligerent. The social worker described him as "a very angry person with a quality of hysteria" whose accusations against the social worker had "a ring of paranoia."
Furthermore, the social worker stated that if Mr. Odom were to be awarded custody of the children, she thought it unlikely "even under the best of circumstances" that he would allow them to have "any positive feelings or attachments" to Mrs. Odom because of his intense anger towards her.
In order to aid the trial court, the social worker also included information gathered in April, 1990, when Mr. Odom made allegations of child abuse against his wife. An interview with a DeSoto Parish deputy sheriff familiar with the Odoms revealed a history of wife abuse in the family, and, due to the unpredictability of Mr. Odom's behavior, the deputy advised the social worker not to interview Mr. Odom alone at his residence. The social worker was unfavorably impressed by both Mr. Odom and his mother. Although they made exaggerated efforts to convince the social worker that Mrs. Odom was an extremely abusive parent, neither could give a satisfactory explanation of why they had not reported her alleged abuse or even sought medical aid for the children until after she left Mr. Odom. The social worker's impression was that Mr. Odom had not been "totally honest" about his role in the alleged abuse or neglect, that he was possibly hiding something, and that "his apparent immediate concern" for the children's safety was questionable.
One of the most important factors to be considered in awarding custody is which parent will be the most willing to foster communication between the children and the noncustodial parent. LSA-C.C. Art. 131(C)(2)(j); Pulley, supra. Based upon the record before us, it is abundantly clear that Mr. Odom will not allow the children to have any sort of relationship with their mother. His deep and bitter hatred of Mrs. Odom, which is obviously shared by his mother, is replete throughout the record in both the home studies and the testimony. (In particular, we note his sarcastic and hostile comments on cross-examination.) Furthermore, he has repeatedly made accusations of child abuse against her which have not stood up to serious scrutiny by the authorities.
These factors weigh heavily against Mr. Odom. The evidence in this record indicates that Mr. Odom is a manipulative and vindictive person who will not hesitate to use his children to punish his former wife. It further demonstrates that his mother, who will exercise great influence over these very young children if custody is maintained in her son, shares these sentiments. To raise Gary and Miranda in an environment in which their mother is so thoroughly vilified can only be deleterious to their emotional well-being.
Although Mr. Odom currently participates in the Methodist church, we note with interest that he left the Jehovah's Witnesses, the faith in which he was raised, because the elders wished to question him about allegations of wife abuse brought to their attention.
Another factor to be considered in awarding custody is stability. At the time of the hearing, the children had only been in their father's physical custody for about two months. Previously, their mother had been the primary care-giving parent.
Although Mrs. Odom admittedly fled the jurisdiction of the court with the children, *869 she did so because of her great fear of Mr. Odom. (Although the trial court made no findings on this issue, we find that the preponderance of evidence in the record demonstrates that Mr. Odom physically abused Mrs. Odom.) While we cannot condone this flight or completely ignore it, we can understand it in the context of this case. Furthermore, our purpose here is to determine what is best for these children, not to use custody as a means by which to punish a parent for past misconduct. Additionally, Mrs. Odom has expressed a willingness to allow the children to develop a relationship with their father, a courtesy he obviously would not extend to her.
We are also favorably impressed by Mrs. Odom's efforts to rebuild her life and improve her financial situation by obtaining a higher education. There is no competent evidence in the record that indicates that the children would be anything but well-cared for and loved in their mother's custody.
Based on the foregoing, we find that Mrs. Odom has carried her burden of proof and that the trial court judgment maintaining custody in Mr. Odom is manifestly erroneous. We find that the overwhelming indications in the record that Mr. Odom will prohibit the children from having any relationship with their mother constitutes a change in circumstances. The best interest of the children dictate that they be placed in the custody of their mother. Accordingly, the trial court judgment is reversed.

CONCLUSION
The judgment of the trial court is reversed. Sole custody of the two minor children is awarded to the appellant, Mrs. Odom, subject to the reasonable visitation of the appellee, Mr. Odom. The matter is remanded to the trial court for further proceedings to determine Mr. Odom's visitation with the children. Costs are assessed against Mr. Odom.
REVERSED AND REMANDED.
NOTES
[1] Although photographs of blemishes on Gary's legs were filed into the record at the these proceedings, we cannot conclusively determine the purpose for which they were used. The photos were apparently taken when the child had impetigo lesions and are connected to Mr. Odom's unfounded abuse allegations against Mrs. Odom. Were we to conclude that Mr. Odom used these pictures as evidence of abuse by Mrs. Odom in order to obtain custody, we would likewise have to conclude that he, at best, misrepresented their contents to the trial court.
[2] Although the record suggests that Mrs. Odom may have moved back to Louisiana since the hearing, our review is confined to the information before the trial court at the custody hearing.
[3] The record contains conflicting evidence about the parties' knowledge of the status of Mrs. Odom's divorce from Mr. Tully. Mrs. Odom testified that Mr. Odom initially financed her divorce proceedings against Mr. Tully, but he later decided that the expense was too great to pursue the matter to final judgment. Thus, he was aware that she was not divorced from Mr. Tully at the time of their remarriage. For his part, Mr. Odom denied having any such knowledge or financing the initial proceedings.