Carolyne Joan SIGG, Plaintiff
and Appellant,

v.

Henry Alfred SIGG, Defendant
and Appellee.

No. 940650–CA.

Court of Appeals of Utah.

Oct. 26, 1995.

E. Paul Wood (argued), Littlefield & Peterson, Salt Lake City, for Appellant.

Clark W. Sessions (argued) and Dean C. Andreasen, Campbell Maack & Sessions, Salt Lake City, for Appellee.

Before DAVIS and WILKINS, JJ., and REGNAL W. GARFF [1], Senior Judge.

## OPINION

REGNAL W. GARFF, Senior Judge:

Carolyne Sigg (Ms. Sigg) appeals a trial court order transferring custody of her two daughters to her former husband, Henry Sigg (Mr. Sigg). Ms. Sigg also appeals the trial court's termination of alimony based on a finding of cohabitation. Finally, Ms. Sigg appeals the trial court's award of court costs, attorney fees, and an expert witness fee to Mr. Sigg. We affirm in part and reverse in part.

## BACKGROUND [2]

The Siggs were married on September 8, 1984, in Auckland, New Zealand, at Ms. Sigg's parents' home. They have two daughters: Nicola, born March 4, 1985, and Lindsay, born January 6, 1989. In July 1990, the couple divorced. The trial court awarded custody of the two girls to Ms. Sigg, while Mr. Sigg received visitation every other weekend, every Tuesday and Thursday evening and at other mutually agreed upon times. Mr. Sigg also received four weeks of visitation during the summer. Additionally, the divorce decree states that in the event that Ms. Sigg elects to move to New Zealand or elsewhere outside of Utah, Mr. Sigg will be allowed sixty (60) days of visitation each year. The decree also requires the parties to "freely and openly communicate regarding actions to be taken in the best interests of the children." Finally, the decree states: "The parties shall take no action to interfere in the enhancement of the other's relationship with the children, nor any action which may be construed in any respect as derogatory toward the other parent in that relationship."

Ms. Sigg resided in Park City until August 1992. At that time, she sold her home and, after a side trip to Colorado to visit her boyfriend, Vic Haynes, she moved to New Zealand. Ms. Sigg did not inform Mr. Sigg

1. Senior Judge Regnal W. Garff, acting pursuant to appointment under Rule 3–108(4) of the Utah Code of Judicial Administration.

2. We view the evidence in a light most favorable to the trial court's findings and recite the facts accordingly. *Van Dyke v. Chappell,* 818 P.2d 1023, 1024 (Utah 1991); *Lake Philgas Service v. Valley Bank & Trust Co.,* 845 P.2d 951, 953 n. 1 (Utah App.1993).

that she was leaving the United States; in fact, he did not learn of her plans until after she had left, taking the couple's children with her.

During the time Ms. Sigg was in New Zealand, Mr. Sigg's contact with the children was severely limited. The children spoke once with their father by telephone; subsequent attempts to speak with the children were thwarted.[3] In November, Mr. Sigg went to New Zealand. At that time, Ms. Sigg had moved from her parents' home, and Mr. Sigg hired a private investigator in order to locate her and the children. During his five-week stay in New Zealand, Mr. Sigg was permitted to visit with the children for only two hours, and that visit was supervised by Ms. Sigg's father.

While in New Zealand, Mr. Sigg hired an attorney to enforce the visitation schedule mandated by the divorce decree. However, the New Zealand court held there had been no violation of the divorce decree because insufficient time had elapsed to determine whether Mr. Sigg would receive his sixty days of visitation.

On February 7, 1993, Ms. Sigg returned to the United States and moved to Boulder, Colorado, where she stayed with Mr. Haynes at his condominium for two weeks before obtaining a second condominium of her own nearby. The trial court found that, over the next few months, Ms. Sigg and Mr. Haynes "lived together as though they were husband and wife"—that they had sexual intercourse, shared living expenses, had open access to the other's condominium, ate together, maintained clothing in the same condominium, and used the same furniture.[4] In August 1993, she and Mr. Haynes purchased a home and moved in together.

The court found that in 1993, Mr. Sigg was "only given a business telephone number through which he could contact his children and [Mr. Sigg] became frustrated and angry when his calls met with answering machine messages [on Mr. Haynes' business phone] and finally instructions from Mr. Haynes that [he] could only speak with his children two evenings each week at 7:00 P.M." Subsequently, a personal line was provided by Ms. Sigg but she was not "candid or forthcoming" in providing the number to Mr. Sigg. As a result of these obstructions, Mr. Sigg apparently became frustrated and left some abusive messages on the answering machine that Ms. Sigg deemed to be telephone harassment. Thereafter, Mr. Haynes filed a complaint with the Boulder police department.

In November, Mr. Sigg filed a Verified Petition for Modification of the Divorce Decree seeking termination of alimony and change in custody or a set schedule of visitation. He also asked for attorney fees.

On December 20, 1993, pursuant to a pre-arrangement with Ms. Sigg, Mr. Sigg went to Boulder for a Christmas visit with his children. Ms. Sigg told him he was to pick them up at a bank parking lot. However, instead of the visit he was arrested on charges of telephone harassment. Ms. Sigg acknowledged during her testimony that the arrest was made after Mr. Haynes notified the police that Mr. Sigg was in Boulder. Moreover, the trial court found that Ms. Sigg broke her agreement to deliver the children at the appointed time and place, and that, after Mr. Sigg was released on bail, Ms. Sigg would allow him to visit his children only under the supervision of a social worker, which Mr. Sigg declined to do. Mr. Sigg hired a lawyer to defend against the charge and spent $1,000.

Trial on Mr. Sigg's petition for modification of the divorce decree was held on June 14 and 15, 1994, before the Honorable David S. Young. Dr. Elizabeth Stewart, an attorney and psychologist appointed to perform a custody evaluation, recommended, both in her report and during trial testimony, that it would be in the best interests of the children to transfer custody to Mr. Sigg. She testi-

---

**3.** This was the trial court's finding, although Ms. Sigg claims the girls telephoned Mr. Sigg every other week and that he telephoned them on alternate weeks.

**4.** Ms. Sigg claims that she and Haynes maintained separate residences, shared few living expenses, and did not keep clothes in the other's condominium. She admits, however, that Haynes had open access to her condominium, visited frequently and that they had intercourse.

fied that Mr. Sigg should have custody of the children because he would facilitate visitation, while Ms. Sigg would not.

The trial judge held that while the children are "closely bonded with each of their parents," and that although the children were "generally doing well in Ms. Sigg's custody," it was in the best interests of the children to award custody to Mr. Sigg. The judge also ruled that Mr. Sigg's $500 per month alimony obligation ceased in February when Ms. Sigg and Mr. Haynes began cohabitating. He also awarded various costs and fees to Mr. Sigg. On September 29, 1994, the trial judge entered an amended decree of divorce. Ms. Sigg appeals from that ruling.

### ISSUES ON APPEAL

Ms. Sigg raises the following issues on appeal. Did the trial court err:

(1) in finding there was a material change in circumstances that warranted reopening the issue of custody of the children?

(2) in concluding that transferring custody to Mr. Sigg was in the best interests of the children?

(3) in terminating alimony in February 1993 based on Ms. Sigg's cohabitation?

(4) in ordering Ms. Sigg to pay for one-third of her day care costs, then equally dividing the remaining costs between Mr. and Ms. Sigg?

(5) in ordering Ms. Sigg to pay Mr. Sigg's costs, attorney fees and expert witness fee?

### STANDARDS OF REVIEW

A trial court's factual findings underlying a holding of material change of circumstances in a divorce decree and a determination of the children's best interests may not be disturbed unless clearly erroneous. *Cummings v. Cummings,* 821 P.2d 472, 476 (Utah App.1991). A court's legal conclusion as to whether a material change in circumstances has occurred that would warrant reconsidering the divorce decree is reviewed for an abuse of discretion. *Wells v. Wells,* 871 P.2d 1036, 1038 (Utah App.1994). A trial

judge's award of custody and support is also reviewed for abuse of discretion. *Sukin v. Sukin,* 842 P.2d 922, 923 (Utah App.1992). A trial court's award of attorney fees, costs and expert witness fees will not be overturned absent an abuse of discretion. *Finlayson v. Finlayson,* 874 P.2d 843, 850 (Utah App. 1994); *Larson v. Larson,* 888 P.2d 719, 726 (Utah App.1994).

### ANALYSIS

#### I.  Change of Custody

Ms. Sigg argues, first, that because Mr. Sigg received all of the visitation ordered in the divorce decree, there were no material changes in circumstances that would justify reopening the question of custody. Second, she argues that if the question of custody is reconsidered, the importance of continuing a stable custody arrangement outweighs any need for a change in custody. We consider each argument in turn.

#### A.  Material Change in Circumstances

Ms. Sigg claims the trial court abused its discretion in finding a material change in circumstances that would allow reopening the divorce decree to review the custody arrangements. We disagree.

In Utah, requests for changes in custody arrangements are considered through a bifurcated procedure. The Utah Supreme Court requires that the trial court first "receive evidence only as to the nature and materiality of any change in those circumstances upon which the earlier award of custody was based." *Hogge v. Hogge,* 649 P.2d 51, 54 (Utah 1982).[5] During this step, the party seeking modification must show: (1) a change of circumstances upon which the earlier custody arrangement was based and (2) that the changes are sufficiently substantial and material to justify reopening the custody question. *Id.* "In other words, if the changed circumstances [are not] the kind of circumstances on which an earlier custody decision was based, there is no valid reason to reconsider that decision." *Becker v. Becker,* 694 P.2d 608, 610 (Utah 1984). Addition-

---

5.  The second step involves a "best interests of the child" analysis, which we consider in section B.

ally, the claimed change must "have some material relationship to and substantial effect on ... the functioning of the presently existing custodial relationship." *Id.*

The trial court ruled that Ms. Sigg's interference with Mr. Sigg's visitation rights constituted a material change in circumstances. The court found that Ms. Sigg, since moving from Park City in 1992, has not complied with provisions of the divorce decree requiring the parties to "freely and openly communicate regarding actions to be taken in the best interests of the children." Moreover, the judge held, such noncompliance showed "a flagrant disregard of the rights of [Mr. Sigg] ... and no desire to be flexible, cooperative or supportive."

This court has acknowledged that visitation interference "may be a factor relevant to" a change of circumstances. *Smith v. Smith,* 793 P.2d 407, 411 (Utah App.1990). This holding is in accord with the view taken in a number of states. *See, e.g., Hermosillo v. Hermosillo,* 797 P.2d 1206, 1209 (Alaska App.1990) (holding that visitation conditions unilaterally imposed by custodial mother upon father was a material change in circumstances); *Moffat v. Moffat,* 27 Cal.3d 645, 165 Cal.Rptr. 877, 881, 612 P.2d 967, 971 (1980) ("The deliberate sabotage of visitation rights not only furnishes ground for modification[;] it is [also] a significant factor bearing on the fitness of the custodial parent."); *Ash v. Ash,* 622 So.2d 1264, 1267 (Miss.1993) (holding that interference with visitation constitutes material change in circumstances); *Amedei v. Amedei,* 801 S.W.2d 491, 493 (Mo.App.

1990) (holding that custodial mother's inflexibility and rigid interpretation of visitation schedule interfered with father's visitation and constituted a change in circumstances); *Lopez v. Lopez,* 97 N.M. 332, 335, 639 P.2d 1186, 1189 (1981) (holding that custodial parent's extreme "lack of cooperation" and refusal to follow visitation order are factors that alone may justify change in custody).

Ms. Sigg disputes the interference claim as a basis for finding a material change in circumstances. She argues there can be no material change of circumstances because Mr. Sigg received all of the visitation ordered in the decree. She claims Mr. Sigg always received the Tuesday and Thursday evening visitation, as well as visitation every other weekend, during the time both parents lived in Park City. Ms. Sigg argues that once she left Utah, Mr. Sigg always received the sixty days of visitation ordered in the divorce decree.

■ However, our review of the record indicates Ms. Sigg has violated the terms of the divorce decree.[6] For example, although Ms. Sigg is correct in pointing out that the divorce decree explicitly contemplates her possible move to New Zealand or elsewhere outside of Utah, it certainly does not anticipate, let alone condone, removing the children without notifying their father.[7] Such notification, although not explicitly required in the decree, is clearly within the scope of the decree's requirement that the couple "freely and openly communicate regarding

6. We note that although there are a number of instances in which Ms. Sigg violated specific provisions of the decree, it is perhaps equally significant that Ms. Sigg's attitude of grudging compliance with the strict letter of the visitation schedule is not conducive to a healthy custodial arrangement. As the Idaho Supreme Court noted, a custodial parent must not only observe the strict letter of a divorce decree, but must also seek to effect the decree's "spirit and intent." *Thurman v. Thurman,* 73 Idaho 122, 127, 245 P.2d 810, 815 (1952).

7. Ms. Sigg vigorously disputes this finding, arguing that she informed Mr. Sigg of her intention to travel to New Zealand. However, a party challenging a trial court's factual finding must do more than merely reargue the evidence supporting his or her position; rather, the party is re-

quired to first marshal the evidence in support of the finding. *Shepherd v. Shepherd,* 876 P.2d 429, 432 (Utah App.1994). Although Ms. Sigg does cite to portions of the trial transcript in which Mr. Sigg testified that he was unaware of Ms. Sigg's plans to travel to New Zealand, she fails to cite the equally crucial recommendations of Dr. Stewart, who states unequivocally that Ms. Sigg left Park City without warning. For this reason, Ms. Sigg falls short of the requirement of marshalling the evidence. *Alta Indus. Ltd. v. Hurst,* 846 P.2d 1282, 1287 (Utah 1993) ("[A]lthough [appellant] cites some evidence that supports the court's findings, even a cursory review of the record reveals [appellant] frequently omits crucial and incriminating evidence and cites testimony ... without reference to conflicting testimony....").

actions to be taken in the best interests of the children."

But even if the decree did not specifically require communication between the parents, it is simply common sense to expect the custodial parent to notify the non-custodial parent of such a significant disruption to a settled visitation pattern. Ms. Sigg's decision to leave the state without warning exemplifies the communication problems that are part and parcel of the kind of visitation interference that has created a material change in circumstances. *See e.g. In re Marriage of Rick L. Clifford,* 515 N.W.2d 559, 560–61 (Iowa App.1994) (finding that custodial mother's move out-of-state without disclosing new address and telephone number to father supported change of custody).

More importantly, Ms. Sigg's failure to apprise Mr. Sigg of her intention to relocate to New Zealand was, as the trial court found, an attempt to "get away from Mr. Sigg for her own piece [sic] of mind" as well as an effort "to separate the girls from contact with" Mr. Sigg.[8] Such a motive is contrary to the decree's mandate requiring open communication and that "the parties shall take no action to interfere in the enhancement of the other's relationship with the children...." Moreover, her desire to separate Mr. Sigg from the children is also grounds in itself for reconsidering the custodial arrangement. In *Alfieri v. Alfieri,* 105 N.M. 373, 733 P.2d 4 (App.1987), the New Mexico Court of Appeals upheld the transfer of custody from the mother to the father where the mother's move out of state was motivated by a desire to interfere with the father's relationship with his children. *Id.* at 383–84, 733 P.2d at 10–11; *In re Marriage of Ciganovich,* 61 Cal.App.3d 289, 132 Cal.Rptr. 261, 264 (1976) (The rule is "well-established ... that removal of the children with the objective of frustrating visitation rights offends the court, offends the interests of the non-custodial parent and offends the welfare of the child."); *see also Thurman v. Thurman,* 73 Idaho 122, 126, 245 P.2d 810, 814 (1952) (holding custodial parent's attempts to alienate affections of non-custodial parent from the child constitutes a material change in circumstances).

Additionally, Ms. Sigg has engaged in other behavior that can only be viewed, on the record before us, as a further attempt to distance the children from their father. Although Mr. Sigg traveled to New Zealand, investing considerable time and money, and remained for five weeks, Ms. Sigg allowed him only one brief supervised visit with the children. Then, after Ms. Sigg moved to Boulder, Colorado, she further restricted Mr. Sigg's access to the children by screening his calls through an answering machine and setting up a rigid schedule allowing him to call two evenings a week at 7 p.m. Such inflexibility was equally evident in her refusal to consent to Mr. Sigg's request to return the children two days late from a family reunion held in New England in August 1992. Dr. Stewart also stated in her report that "[T]here was a clear intent to interfere with the children's relationship with their father and that problems with visitation were not merely matters of scheduling or concern about the length of the visits." Further, Ms. Sigg has failed to keep Mr. Sigg appraised of the children's schooling and health.

A more extreme example of Ms. Sigg's willingness to interfere with Mr. Sigg's visitation was the episode in which Mr. Sigg was arrested in Boulder, Colorado, on telephone harassment charges filed by Ms. Sigg's boyfriend, Mr. Haynes. Although Ms. Sigg claims Mr. Haynes told the police of Mr. Sigg's whereabouts and that she "didn't know for sure" that he would be arrested, it defies common sense to believe she was oblivious to the impending arrest in the bank parking lot where she had instructed Mr. Sigg to pick up the children rather than at her home. Such behavior evinces not only contempt for Mr. Sigg, but also a willingness to involve the children, who had been led to believe they would spend the Christmas holiday with their father. Moreover, Ms. Sigg must have known that the arrest and jailing of Mr. Sigg would only exacerbate the hostili-

---

8. This finding was part of the report of the court-appointed psychologist which was incorporated into the trial court's findings of fact. As such, we will not overturn it absent clear error. We also note that because appellant failed to marshal the evidence in favor of the factual findings, we accept the findings as correct.

ties between the two of them, thus further eroding the communication and cooperation needed to foster a working custodial arrangement.

▮ A custodial parent's inflexibility regarding visitation may in itself constitute a material change in circumstances. *See Norenberg v. Norenberg,* 168 N.W.2d 794, 797 (Iowa 1969) (holding conflict between non-custodial mother and custodial father's second wife over visitation upset child and constituted a material change in circumstances); *Pulley v. Pulley,* 587 So.2d 116, 120 (La.App. 1991) (affirming finding of material change in circumstances where the custodial mother "seized virtually every opportunity to deny [non-custodial father] his court-ordered visitation privileges or to make the exercise of those privileges inconvenient or frustrating."); *see also Hermosillo,* 797 P.2d at 1209; *Ash,* 622 So.2d at 1267; *Amedei,* 801 S.W.2d at 493.

In sum, we find no error in the trial court's factual findings. Nor do we find an abuse of discretion in its conclusion that Ms. Sigg's interference with Mr. Sigg's visitation rights constituted a material change in circumstances. These flagrant actions by Ms. Sigg all support the court's conclusion that there has been a change in circumstances that is material to the custody issue. We recognize that changing the custodial parent is a serious step and can have far reaching implications for the children. Generally, it is in a child's best interest to have custody stabilized with one parent. However, it is equally important for that child to have an ongoing, loving relationship with the other parent. The preservation of parent relationships is in the best interest of the children as well as the parents. However, this cannot occur if visitation is constantly interfered with, and the more egregious this interference, the more it involves the child in the parent's disputes and impacts the well-being and peace-of-mind of the child. In the words of Dr. Stewart:

Ms. Sigg's reasoning about visitation and also terminating Mr. Sigg's parental rights by Mr. Haynes' adoption of the children … reflects her serious deficiencies in her reasoning and judgment. She is totally insensitive to the importance to children of having contact with their natural parents and the advantages to them as well as the parents of maintaining contact through regular visitation.

While changing custody over visitation interference is drastic action, it is justified in instances as extreme as the present case. Thus, the trial court appropriately decided to reopen the question of custody based on the changed circumstance of visitation interference.

### B. Best Interests of the Children

▮ After concluding there is a material change in circumstances justifying reopening the issue of custody, the trial court "must consider the changes in circumstance along with all other evidence relevant to the welfare or best interests of the child, including the advantage of stability in custody arrangements that will always weigh against changes in the party awarded custody." *Hogge v. Hogge,* 649 P.2d 51, 54 (Utah 1982). This court has articulated the following factors that may [9] be considered by a trial court in conducting a best-interests-of-the-child analysis:

The need for stability in custodial relationship and environment; maintaining an existing primary custodial bond; the relative strength of parental bonds[;] [t]he relative abilities of the parents to provide care, supervision, and a suitable environment for the children and to meet the needs of the children; [p]reference of a child able to evaluate the custody question; [t]he benefits of keeping siblings together, enabling sibling bonds to form; [t]he character and emotional stability of the custodian; and [t]he desire for custody; the apparent commitment of the proposed custodian to parenting.

---

9. Ms. Sigg states in her brief that these factors "must be included in determination of the best interests of a child in a custody dispute." However, *Moon* specifically states that "[t]his list is not exhaustive, and in making it, we do not prescribe consideration of any enumerated set of concepts." *Moon v. Moon,* 790 P.2d 52, 54 n. 2 (Utah App.1990).

*Moon v. Moon,* 790 P.2d 52, 54 (Utah App. 1990) (citations omitted).[10] Additionally, this court has also stated that "interference with visitation may be a factor relevant to the issues of both a change in circumstances and the child's best interests." *Smith,* 793 P.2d at 411.

In its ruling, the trial court discusses several of these factors,[11] but the court's main concern is with the interference with visitation.[12] The court notes that while the custody and visitation arrangement worked well during the first fifteen months, and that the children are "bonded" with both parents, "tension has been created by [Ms. Sigg] because of her limiting or controlling the children's contact with [Mr. Sigg]." The court concluded that Ms. Sigg's actions constituted a "flagrant disregard of the rights of" Mr. Sigg.

This court gives "considerable discretion" to the trial court in making custody decisions, "unless it appears that the trial court has given short shrift to the statutory criteria." *Moon,* 790 P.2d at 54–55. A trial court's " 'findings of fact should reflect that the court considered stability as a factor in the custody decision and the weight the court accorded it.' " *Cummings v. Cummings,* 821 P.2d 472, 479 (Utah App.1991) (quoting *Elmer v. Elmer,* 776 P.2d 599, 605 (Utah 1989)). Moreover, " 'a lengthy custody arrangement in which a child has thrived ought rarely, if at all, to be disturbed, and then only if the circumstances are compelling.' " *Id.* at 479 (quoting *Elmer,* 776 P.2d at 604).

Ms. Sigg argues that the court did give short shrift to the factor concerning "the need for stability in custodial relationship" and "maintaining an existing primary custodial bond." We must disagree. Although the trial court's memorandum decision does not focus extensively on the stability factor, that factor is dealt with at length in the report and testimony of Dr. Stewart. She interviewed both parents and the children as part of her evaluation. She also explicitly addressed each factor enunciated in Rule 4–903 of the Utah Code of Judicial Administration, which addresses uniform custody evaluations.

Addressing factor (3)(D) of Rule 4–903, which concerns "the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted," Dr. Stewart noted that "[t]he children are not happy with the angry disputes between the parents and specifically they are not happy with the restrictions on visitation with their father that have been imposed upon them." She goes on to note that neither child likes Mr. Haynes, whose presence along with the tensions between Mr. and Ms. Sigg have given the children "sad feelings." She states that although the custody arrangements worked well during the first fifteen months after the divorce, they have now deteriorated since Ms. Sigg went to New Zealand and "has failed to facilitate visitation with the children except on her terms which are not in their best interests."

Because Dr. Stewart's evaluation is incorporated by reference in the trial court's memorandum decision, it can hardly be said that the court has given "short shrift" to these factors. Moreover, Dr. Stewart also provided extensive testimony during the trial, stating that although stability is important,

> stability cannot be used to maintain an ... unsatisfactory situation that's creating tension for the children. If a change of custo-

---

10. These factors are substantially the same as, although not identical to, the factors that must be addressed during a court-ordered custody evaluation. Utah Code Jud.Admin. R4–903. The custody evaluation process is considered more extensively in Section I–B of this opinion.

11. Other factors considered by the court were that one of the children expressed a preference to live with Mr. Sigg; the fact that Mr. Sigg has a stable marriage; and that the children were raised in and accustomed to Park City, where they are close to extended family and friends. The court also incorporates by reference the report of Dr. Stewart, the psychologist who performed the custody evaluation, who characterized Ms. Sigg as "emotionally distant" and "reluctan[t] to make emotional commitments."

12. "Interference by the custodial parent with a noncustodial parent's visitation rights as ordered by the court may clearly be contrary to a child's best interest." *Smith,* 793 P.2d at 411.

dy looks like it is creating instability, putting the children in a high risk situation, or if there's any indication that there are petitions to move the children back and forth for reasons that are not for the children's benefit, but because of maliciousness on the part of the parents or irresponsibility, that's different. But there's no reason to think that these children will not do as well in their father's home as in their mother's home.

■ Thus, we must conclude that the trial court was acting within its broad discretion in awarding custody to Mr. Sigg. *See Moon*, 790 P.2d at 54–55.[13] We also emphasize that while the trial court's focus, and our own, has been on the actions of Ms. Sigg, the decision to change custody is not intended as punishment. *Deeben v. Deeben*, 772 P.2d 972, 974 n. 4 (Utah App.1989) ("We emphasize trial courts must not reward or punish parents for their conduct during a marital relationship through a custody award."). In fact, it is clear that both parents love their children and that the children have done well under their mother's care.[14] Nonetheless, we endorse the trial court's goal of arranging custody in a way that fosters a relationship with both parents. To that end, we encourage both parents to now set aside their differences and work together unselfishly for the best interests of their children.[15]

## II. Cohabitation

■ Ms. Sigg claims that the trial judge erred in determining that she and her boyfriend, Vic Haynes, began cohabitating in February 1993, and terminating Mr. Sigg's alimony obligation at that date. Rather, Ms. Sigg argues she and Haynes did not begin cohabitating until August 1993 when the two of them purchased a house and moved in together.

■ In Utah, a party's obligation to pay alimony to a former spouse is terminated upon a showing of "cohabitation," which means the former spouse is residing with a person of the opposite sex and engaging in sexual contact with that person. Utah Code Ann. § 30–3–5(6) (1995). Common residency means "the sharing of a common abode that both parties consider their principal domicile for more than a temporary or brief period of time. Sexual contact means participation in a relatively permanent sexual relationship akin to that generally existing between husband and wife." *Haddow v. Haddow*, 707 P.2d 669, 672 (Utah 1985).

The trial court found that when Ms. Sigg returned from New Zealand in February 1993, she and Haynes "in effect resided together," even though they had separate con-

---

13. Ms. Sigg also asserts error in the trial court's refusal to grant a continuance in light of the late filing of Dr. Stewart's report. Rule 40(b) of the Utah Rules of Civil Procedure grants a trial court "substantial discretion" in deciding whether to grant a continuance. *Christenson v. Jewkes*, 761 P.2d 1375, 1377 (Utah 1988). As Mr. Sigg points out, the release of her evaluation would not seem to prejudice either party because both sides had opportunity to conduct discovery, engage expert witnesses and prepare for trial. Moreover, the late release of the report did not give either side an advantage because neither party knew its contents until it was actually released. Thus, any error would be harmless.

14. Dr. Stewart acknowledged during testimony and in her report that the children are "doing very well. They've always done well in school and they have been well taken care of. They are well clothed and well dressed. Ms. Sigg takes particular attention to matters of being polite and tidy.... The children, all the children involved reported to be happy." Dr. Stewart also acknowledged that during the 48 months the children were in Ms. Sigg's custody, there were

only 10 months during which no visitation took place.

15. Since the custodial/noncustodial roles are now reversed, it is hoped that the parents will interact with each other in a mature manner, and that, for the sake of the children, visitation will be on a more amicable basis. Dr. Stewart points out that the visitation conflicts presented in this instance are not atypical, and more often result because of lingering resentments between parents. Mature adults will evidence a serious appreciation and understanding of the importance of both parents to the children. The custodial parent has a responsibility to facilitate the relationship between the noncustodial parent and the children through regular visits and conveyance of information about the children's significant school and social activities. Visitation is a means of promoting continuity and stability in the children's parental relationships. We endorse these observations of Dr. Stewart and add that children have not only a need but also a right to a stable home environment in the homes of both parents.

dominiums in the same condominium complex. At that time, the trial court found, the two had a sexual relationship, shared living expenses, had open access to each other's condominiums, ate together and shared food expenses, kept clothing in the same condominium, used the same furniture and "otherwise lived as though they were husband and wife."

■ Although Ms. Sigg contests some of these findings (she claims they did not regularly share living and food expenses and did not keep clothing at the same condo), the weight of the evidence supports the finding of cohabitation beginning in February 1993. Findings of fact will not be disturbed unless clearly erroneous. *Cummings*, 821 P.2d at 476. Obviously, the trial court found Ms. Sigg's testimony to be unpersuasive, and there was substantial evidence establishing that Ms. Sigg and Haynes were cohabitating. Thus, we affirm the trial court's finding.

### III. Day Care Costs

■ Ms. Sigg contends that the trial court abused its discretion in requiring her to be solely responsible for one-third of the day-care costs, then splitting the remaining costs between Mr. and Ms. Sigg. She claims this was in error because there was unrebutted testimony that she needed day care because her job required her to work at home. Thus, the trial court's decision is "arbitrary and capricious."

In making this determination, the judge acknowledged that he had "no great basis to determine" how much of the claimed day care costs should be awarded. Because the judge cites no evidence and essentially acknowledges his decision is not based on fact, we reverse and instead require the parties to share the day care costs evenly.

### IV. Fees and Costs

■ Ms. Sigg claims the trial court erred in awarding to Mr. Sigg $14,000 in attorney fees expended in connection with the petition for modification; $1,000 spent in defending against the telephone harassment charge; and $3,000 in expert witness fees spent on the custody evaluation performed by Dr. Stewart.

Ms. Sigg contends the award of those fees is without statutory basis. Under section 30-3-5(8) of the Utah Code, a court may award attorney fees to the prevailing party in an action alleging substantial noncompliance with a visitation order. Utah Code Ann. § 30-3-5(8) (1995). She claims that Mr. Sigg has received all the visitation provided for in the divorce decree and, thus, he should not have been awarded attorney fees under section 30-3-5(8). However, because we have concluded that Ms. Sigg did not comply with the visitation order contained in her decree, we find no abuse of discretion by the court and affirm the award of attorney fees to Mr. Sigg, the prevailing party.

■ Ms. Sigg also attacks the award of $1,000 to Mr. Sigg representing his expenses in defending against the telephone harassment charge. These costs have no direct relationship to the costs of pursuing the petition for modification of the divorce decree. The award, for that reason, is without basis in law and an abuse of discretion. Accordingly, we reverse.

■ Finally, Ms. Sigg attacks the award of the expert witness fees for the testimony of Dr. Stewart, the court-appointed custody evaluator. However, section 30-3-5(8) also allows the award of "actual attorney fees and court costs incurred by the prevailing party because of the other party's failure to provide or exercise court-ordered visitation." Utah Code Ann. § 30-3-5(8) (1995). Because Mr. Sigg is the prevailing party, and because Dr. Stewart's custody evaluation was a court cost incurred as a result of Ms. Sigg's failure to provide or permit visitation, we find no abuse of discretion in awarding the expert witness fees to Mr. Sigg. Finally, we conclude that each party should bear their own costs and attorney fees incurred on appeal.

### CONCLUSION

We affirm the change of custody from Ms. Sigg to Mr. Sigg based on, among other things, visitation interference. We find no abuse of discretion in the trial court's finding

of a material change in circumstances. We also find no error in the trial court's determination that the best interests of the children would be served by transferring custody to Mr. Sigg because he would be better able to foster a relationship between the children and both parents. We also affirm the trial court's finding that Mr. Sigg's alimony obligation terminated in February 1993 when Ms. Sigg and Mr. Haynes began cohabitating. In addition, we affirm the award of attorney fees to Mr. Sigg, but reverse the award of the $1000 spent by Mr. Sigg in defending against the telephone harassment charge. As for the day care costs, we reverse and require instead that the parties split the costs evenly. Finally, we hold there was no abuse of discretion in awarding the cost of the custody evaluation to Mr. Sigg.

JAMES Z. DAVIS, Associate P.J., and WILKINS, J., concur.