1999 UT App 290

**Abby (Carpenter) HUDEMA, Petitioner and Appellant,**

v.

**Wade CARPENTER, Respondent and Appellee.**

No. 981356–CA.

Court of Appeals of Utah.

Oct. 15, 1999.

Larry R. Keller, Keller & Lundgren, LC, Salt Lake City, for Appellant.

James M. Park, The Park Firm, Cedar City, for Appellee.

Before GREENWOOD, Associate P.J., BILLINGS, and ORME, JJ.

## OPINION

ORME, Judge:

¶ 1 Appellant Abby Hudema appeals the trial court's order awarding custody of her son, Jackson Carpenter, to her former husband, appellee Wade Carpenter. She particularly challenges the trial court's findings premised on her perceived moral and religious deficiencies. We affirm.

## BACKGROUND

¶ 2 Hudema and Carpenter were married on November 3, 1989. Their son, Jackson, was born two and one-half years later. In September 1994, Hudema filed for divorce. After Hudema and Carpenter agreed to a stipulated settlement, the court entered a divorce decree incorporating the agreed terms early in 1995.

¶ 3 Pursuant to the stipulated agreement, the court ordered that Hudema and Carpenter share joint legal custody of Jackson, that Hudema have sole physical custody, and that Carpenter pay child support and have rights to reasonable visitation. For the next few months, both parents were closely involved with Jackson, but in June 1995, Carpenter moved from Davis County to Brian Head, Utah to accept a new job. Because this new position carried a higher salary, Hudema filed a petition to modify the divorce decree, requesting an increase in the amount of child support. Carpenter responded with his own petition to modify the divorce decree, arguing that changed circumstances required a modification of custody.

¶ 4 Since their divorce, Hudema and Carpenter have each remarried. On September 29, 1995, Carpenter married his new wife, Stacy. The Carpenters subsequently had a daughter, Shelby, Jackson's half-sister. In July 1997, Hudema moved to Arizona to join her new husband, Craig Hudema. The two were married in August of that year.

¶ 5 In April 1997, the court appointed Margaret Chapman, a licensed clinical social worker, as a custody evaluator to aid its custody determination. Chapman interviewed Hudema, Carpenter, and Jackson; observed Jackson with Hudema at their Davis County and Arizona homes, and Jackson with Carpenter in Brian Head; and reviewed various letters of reference. She then submitted her report to the court, recommending that Carpenter be awarded sole custody of Jackson, with liberal visitation for Hudema.

¶ 6 The matter was finally tried, after which the court entered its findings of fact and conclusions of law on May 8, 1998. The court granted custody of Jackson to Carpenter and visitation rights to Hudema. The court found there was a change in circumstances sufficient to allow modification of the divorce decree. Indeed, the parties agreed that the original custody and visitation arrangement had become unworkable and requested a change. In support of its disposition, the court made findings on many factors concerning Jackson's needs and his parents'

character and abilities, in general conformance with the guidelines for child custody evaluations. *See* Utah Code Jud. Admin. R4–903.[1] That is, the court made findings of fact bearing on each pertinent factor outlined in Rule 4–903. It also noted whether each finding was of neutral weight or supported awarding custody to one parent or the other.

¶ 7 Among the neutral factors, the court concluded that Jackson was attached to both parents; both home environments were stable and, although possessing different benefits and detriments, each location would be a positive environment; both parents strongly and equally desired custody; both parents were able to provide personal, rather than surrogate, care; neither parent was impaired by drugs or alcohol; both parents were of sufficient financial means to provide Jackson a good environment; and both parties exhibited a "lack of cooperation and maturity" in scheduling visitation, thus requiring a structured visitation schedule.

¶ 8 Turning to the findings favoring one parent or the other, the court concluded Jackson was precocious, happy, and well-adjusted under the existing arrangement, suggesting Hudema should retain custody. On the other hand, the court concluded these factors supported changing Jackson's custody to Carpenter: Jackson had a stronger bond with his father; Jackson had more kinship ties, including with his half-sister, Shelby, and Hudema's extended family, in southern Utah; and Chapman and other witnesses believed that it was in Jackson's best interests to award custody to Carpenter, and such recommendations were supported by the evidence.

¶ 9 Of particular concern in this appeal, the court found two additional factors favored granting Carpenter custody. First, the court found that because Hudema moved to Arizona in July 1997 and stayed with Craig Hudema pending their marriage the following month, a comparison of Carpenter's and Hudema's "moral character and emotional stability ... favor[ed] placing Jackson with Wade Carpenter." Second, the court found Carpenter was more religiously compatible

---

1. Neither party asserts the court failed in any way to properly consider other relevant factors.

with Jackson than was Hudema. That is, even though Carpenter and Hudema were both members of the Church of Jesus Christ of Latter-day Saints (LDS or Mormon) and had agreed to raise Jackson in that faith, the court concluded that Carpenter was more religiously compatible with Jackson because Carpenter took Jackson to church and actively participated in religious activities with him, while Hudema took Jackson to church but did not always attend services with him.

¶ 10 After explaining its underlying findings and conclusions, the court noted that "both parents in this case love and care for Jackson a great deal" but concluded it was in Jackson's best interests for Carpenter to have primary custody. Accordingly, on May 8, 1998, the court entered an order modifying the divorce decree and granting Carpenter sole physical custody of Jackson, to begin after he completed kindergarten. Hudema was given structured visitation rights and ordered to pay child support.

¶ 11 Following trial, Hudema obtained new counsel. In April 1998, her new counsel filed various motions, including a motion for new trial and a motion to open judgment, to allow further testimony and an additional custody evaluation.[2] The memorandum supporting the motion to open judgment requested that the court appoint a second evaluator, claimed Hudema received ineffective assistance of counsel at trial, and contained just under fifty pages of exhibits. Hudema's memorandum supporting her motion for new trial argued that the court failed to properly weigh the important interest in preserving the existing custody arrangement, the first custody evaluation was unfair, the court misconstrued the issue of religious compatibility, and Hudema received ineffective assistance at trial. It contained nearly 150 pages of exhibits. Hudema's new counsel also filed an objection to the proposed findings and conclusions prepared by Carpenter's counsel and requested a stay of execution pending ruling

on Hudema's motions for new trial and to open judgment. The motion to open judgment and the motion for new trial were followed by a twenty-page affidavit of Hudema and numerous exhibits. The exhibits included affidavits of Jillynn Stevens, a Utah licensed clinical social worker, and Carol Mellen, Ph.D., a clinical psychologist employed in Phoenix, Arizona, both of whom conducted evaluations and recommended that Hudema retain custody, and twenty-seven letters of reference not submitted during trial. Later, in an apparent effort to exhaust all possible avenues of relief, Hudema's counsel also filed a motion for relief from judgment under Rule 60(b), incorporating the grounds raised in the prior motions and arguing mistake and excusable neglect by Hudema's prior counsel and surprise in the admission of evidence at trial.

¶ 12 Carpenter objected to Hudema's motions. Carpenter further moved to strike the exhibits and affidavits submitted with Hudema's motion for new trial and the affidavits of Hudema, Stevens, and Mellen, with accompanying exhibits, arguing Hudema was impermissibly attempting to retry the case with new evidence, albeit evidence that could have been presented at trial. Carpenter also requested attorney fees incurred in responding to Hudema's post-trial filings, arguing that the numerous exhibits and affidavits were not permitted under Rule 59 and violated applicable page limitations.

¶ 13 After a hearing on June 24, 1998, the court denied Hudema's motions and ordered all exhibits, affidavits, and letters—except Hudema's affidavit—stricken. The trial court agreed that Hudema was impermissibly attempting to retry the case and that Carpenter should be compensated for the attorney fees incurred in responding to the stricken material. Although Carpenter's counsel submitted an affidavit requesting $5,698.80, the trial court has not yet fixed the

---

**2.** Hudema characterized this motion as a "Motion to Open Judgment." However, Rule 59 makes no separate provision authorizing a motion to open judgment. Rather, on a motion for new trial after a bench trial, "the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." Utah R. Civ. P. 59(a). Accordingly, the grounds raised in Hudema's two motions should have been included in a single motion for new trial under Rule 59.

amount of attorney fees. On July 1, 1998, Hudema filed her notice of appeal.

## JURISDICTION ON APPEAL

■ ¶ 14 Before turning to the issues raised by the parties, we address our jurisdiction to hear this appeal. Although neither party has moved to dismiss the appeal, we consider the matter sua sponte to clarify an area of possible misunderstanding. *See In re Adoption of Baby K.,* 967 P.2d 947, 949 n. 2 (Utah Ct.App.1998) ("[T]he parties' acquiescence does not confer jurisdiction on the court, 'and a lack of jurisdiction can be raised by the court or either party at any time.' ") (quoting *A.J. Mackay Co. v. Okland Constr. Co.,* 817 P.2d 323, 325 (Utah 1991)).

■ ¶ 15 This court has jurisdiction to hear an appeal as of right only if a notice of appeal is timely filed. *See* Utah R.App. P. 3(a); *State v. Jiminez,* 938 P.2d 264, 265 (Utah 1997) (holding no jurisdiction where notice of appeal was prematurely filed); *Kay v. Summit Sys., Inc.,* 924 P.2d 338, 338 (Utah 1996) (per curiam) (same). Generally, a notice of appeal is timely if filed "within 30 days after the date of entry of the judgment or order appealed from." Utah R.App. P. 4(a). However, if a party makes a timely motion for new trial under Rule 59, Utah Rules of Civil Procedure, the thirty-day period "run[s] from the entry of the order denying a new trial." Utah R.App. P. 4(b). Conversely, "[a]n untimely motion for a new trial has no effect on the running of the time for filing a notice of appeal." *Burgers v. Maiben,* 652 P.2d 1320, 1321 (Utah 1982) (per curiam).

¶ 16 In this case, the trial court entered its findings, conclusions, and order modifying the divorce decree on May 8, 1998. However, more than two weeks earlier, on April 22, 1998, Hudema had served her various motions, including her Rule 59 motion for new trial. On June 24, 1998, the trial court entered its order denying these motions and, on July 1, 1998, Hudema filed her notice of appeal. Accordingly, if Hudema's Rule 59

motion was timely, the thirty-day period in which to file her notice of appeal began on June 24, and her July 1 notice of appeal was also timely. However, if Hudema's Rule 59 motion was not timely, her notice of appeal was likewise untimely and we are without jurisdiction. Consequently, we have jurisdiction over this appeal only if a Rule 59 motion made *before* entry of judgment is properly regarded as timely.

¶ 17 This court recently held in a criminal case that a premature motion for new trial— i.e., one filed after conviction but before sentencing—was not timely and thus did not extend the period for filing a notice of appeal. *See State v. Vessey,* 957 P.2d 1239, 1240 (Utah Ct.App.1998) (per curiam). *Id.* (quoting *Burgers,* 652 P.2d at 1321). This court looked to the plain language of Rule 24 of the Utah Rules of Criminal Procedure,[3] specifically the phrase "*after* imposition of *sentence,*" to conclude that "[t]he rule does not provide for timeliness of motions filed after announcement, but prior to entry of judgment." *Id.* (emphasis in original). Similarly, in interpreting Rule 59, we look to its plain language. Further, we are mindful that the Rules of Civil Procedure "shall be liberally construed to secure the just, speedy, and inexpensive determination of every action." Utah R. Civ. P. 1(a).

■ ¶ 18 Rule 59 provides that a motion for new trial "shall be served *not later than* 10 days after the entry of the judgment." Utah R. Civ. P. 59(b) (emphasis added). The word "later" is a comparative form of the word "late," which is defined as "coming or doing after the due, usual, or proper time." *Webster's Third New International Dictionary* 1275 (1976). Thus, the phrase "not later than" prohibits motions made after the due, usual, or proper time, and Rule 59 designates such time as "10 days after the entry of the judgment." Consequently, Rule 59 sets an outside deadline but does not prohibit early service, and Hudema's motions were timely.[4] Rule 59's use of "not later than"

---

3. Rule 24 provides: "A motion for a new trial shall be made within 10 days after imposition of sentence, or within such further time as the court may fix during the ten-day period." Utah R.Crim. P. 24(c).

4. The same result was recently reached in *Kurth v. Wiarda,* 981 P.2d 417, 419 (Utah Ct.App.1999) (per curiam), and *Regan v. Blount,* 978 P.2d 1051, 1054 (Utah Ct.App.1999) (per curiam).

stands in sharp contrast to Rule 24's use of "within" to describe the time for filing a motion for new trial in a criminal case, which proscribes both late *and* early filings. *See Webster's Third New International Dictionary* 2627 (1976) (defining "within" as "on the inside or on the inner side" and "inside the bounds of a place or region"). *See also* Fed.R.Civ.P. 59 advisory committee's note ("The phrase 'no later than' is used—rather than 'within'—to include post-judgment motions that sometimes are filed before actual entry of the judgment by the clerk.").

■ ¶ 19 Accordingly, we conclude that we have jurisdiction over this appeal. Hudema's Rule 59 motion for a new trial, although early, was timely in the jurisdictional sense and thus extended the period in which she could file her notice of appeal. Because Hudema actually filed her notice of appeal during this extended period, it was likewise timely and properly invoked the jurisdiction of this court.

## ISSUES AND STANDARDS OF REVIEW

¶ 20 On appeal, Hudema contends the trial court erred in: (1) concluding the circumstances were sufficiently changed to warrant modifying the existing custody arrangement; (2) awarding primary physical custody of Jackson to Carpenter; (3) denying Hudema's motion for new trial, especially insofar as it challenged the trial court's reliance on Chapman's evaluation; and (4) awarding attorney fees incurred by Carpenter in responding to Hudema's post-trial motions, affidavits, and exhibits.

■ ¶ 21 In *Sigg v. Sigg*, 905 P.2d 908 (Utah Ct.App.1995), this court identified several of the standards of review applicable here:

A trial court's factual findings underlying a holding of material change of circumstances in a divorce decree and a determination of the children's best interests may not be disturbed unless clearly erroneous. A court's legal conclusion as to whether a material change in circumstances has occurred that would warrant reconsidering the divorce decree is reviewed for an abuse of discretion. A trial judge's award of custody ... is also reviewed for abuse of discretion.

*Id.* at 912 (citations omitted). We review the court's denial of Hudema's motion for new trial for an abuse of discretion. *See ProMax Dev. Corp. v. Mattson,* 943 P.2d 247, 253 (Utah Ct.App.), *cert. denied,* 953 P.2d 449 (Utah 1997). Finally, whether attorney fees should be awarded as a sanction for filing frivolous or bad-faith motions or affidavits under Rule 11, Utah Rules of Civil Procedure,[5] is a question of law we review for correctness. *See Bailey–Allen Co. v. Kurzet,* 945 P.2d 180, 193–94 (Utah Ct.App.1997).

## CHANGED CIRCUMSTANCES

■ ¶ 22 We first address Hudema's argument that the trial court erred in finding changed circumstances sufficient to justify modifying the custody arrangement. Before modifying a custody order, the court conducts a bifurcated inquiry to determine, first, if there has been a substantial and material change in the circumstances upon which the award was based, and, if so, whether a modification is in the best interests of the child.

---

**5.** Although the trial court characterized the award of attorney fees as one pursuant to Utah Code Ann. § 30-3-3(2) (1998), this subsection authorizes fees only for "any action to enforce an order"—not as a sanction. Because Rule 11 does authorize attorney fees as a sanction, we evaluate the court's ruling according to Rule 11. *See Orton v. Carter,* 970 P.2d 1254, 1260 (Utah 1998) ("It is well established that an appellate court may affirm a 'judgment, order, or decree appealed from if it is sustainable on any legal ground or theory apparent on the record,' even though that ground or theory was not identified by the lower court as the basis of its ruling.") (citation omitted). We further note, however, that because Carpenter made no argument below or on appeal that sanctions were appropriate under Utah Code Ann. § 78-27-56 (1996), and the trial court found only that the exhibits and attachments to the post-trial motions were inappropriate, not that the motions themselves were without merit or not brought in good faith, we do not address the applicability of section 78-27-56. *See Valcarce v. Fitzgerald,* 961 P.2d 305, 315 (Utah 1998) ("Under section 78-27-56, attorney fees may be awarded 'if the court determines that the action or defense to the action [i] was without merit and [ii] not brought or asserted in good faith.'") (alteration in original; citation omitted).

*See* Utah Code Ann. § 30–3–10.4 (1998);[6] *Elmer v. Elmer,* 776 P.2d 599, 602 (Utah 1989); *Sigg v. Sigg,* 905 P.2d 908, 912 & n. 5 (Utah Ct.App.1995). The required finding of changed circumstances promotes the policies of preserving stability in the child's relationships and preventing the burden on the parties and courts of successive adjudications. *See Elmer,* 776 P.2d at 602. Consequently, the court generally may not consider evidence of the child's best interests until it finds changed circumstances. *See Wright v. Wright,* 941 P.2d 646, 650–51 (Utah Ct.App. 1997). However, when a custody order is entered pursuant to a stipulated agreement, rather than a prior adjudication of the child's best interests, "the res judicata policy underlying the changed-circumstances rule is at a particularly low ebb." *Elmer,* 776 P.2d at 603. *See id.* at 605.

¶ 23 In this case, the trial court ruled there was a substantial and material change of circumstances concerning Jackson, Hudema, and Carpenter. The court based this determination on various factual findings, including that, subsequent to the original custody order, both parents had remarried and moved to new communities separated by a distance that prohibited Jackson's daily contact with both parents, and Jackson had begun school, making extended periods of visitation unworkable during most of the year. In light of these facts, we conclude the court did not abuse its discretion in finding changed circumstances.

### JACKSON'S BEST INTERESTS

¶ 24 We now turn to the court's decision awarding Carpenter sole physical custody of Jackson. Hudema argues that the court abused its discretion in this regard because it failed to accord proper weight to maintaining stability and because it incorrectly concluded that certain factors, especially when weighed relative to the others, favored a change in custody.

¶ 25 When assessing whether a custody change is in the best interests of a child, the trial court looks to many factors. Regarding the child's feelings and needs, the court accounts for

> "the preference of the child; keeping siblings together; the relative strength of the child's bond with one or both of the prospective custodians; and, in appropriate cases, the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted."

*Tucker v. Tucker,* 910 P.2d 1209, 1215 (Utah 1996) (quoting *Hutchison v. Hutchison,* 649 P.2d 38, 41 (Utah 1982)). Regarding the parents' character and capacity, the court must further examine

> "moral character and emotional stability; duration and depth of desire for custody; ability to provide personal rather than surrogate care; significant impairment of ability to function as a parent through drug abuse, excessive drinking, or other cause; reasons for having relinquished custody in the past; religious compatibility with the child; kinship, including, in extraordinary circumstances, stepparent status; and financial condition."

*Id.* (quoting *Hutchison,* 649 P.2d at 41).[7]

¶ 26 Although the court considers many factors, each is not on equal footing.

Utah Code Ann. § 30–3–10.4(1) (1998).

6. This subsection provides:

> On the motion of one or both of the joint legal custodians the court may, after a hearing, modify an order that established joint legal custody if:
> (a) the circumstances of the child or one or both custodians have materially and substantially changed since the entry of the order to be modified, or the order has become unworkable or inappropriate under existing circumstances; and
> (b) a modification of the terms and conditions of the decree would be an improvement for and in the best interest of the child.

7. These factors echo Rule 4–903 of the Utah Code of Judicial Administration, which provides in part:

> Evaluators must consider and respond to each of the following factors:
> (A) the child's preference;
> (B) the benefit of keeping siblings together;
> (C) the relative strength of the child's bond with one or both of the prospective custodians;
> (D) the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted;

Generally, it is within the trial court's discretion to determine, based on the facts before it and within the confines set by the appellate courts, where a particular factor falls within the spectrum of relative importance and to accord each factor its appropriate weight. *See Davis v. Davis,* 749 P.2d 647, 648 (Utah 1988); *Childs v. Childs,* 967 P.2d 942, 945 (Utah Ct.App.1998), *cert. denied,* 982 P.2d 88 (Utah 1999). The importance of the myriad of factors used in determining a child's best interests ranges from the possibly relevant to the critically important. At the critically important end of the spectrum, when the child is thriving, happy, and well-adjusted, lies continuity of placement. *See Davis,* 749 P.2d at 648 ("In considering competing claims to custody between fit parents under the 'best interests of the child' standard, considerable weight should be given to which parent has been the child's primary caregiver."); *Paryzek v. Paryzek,* 776 P.2d 78, 82 (Utah Ct.App. 1989) ("[T]rial courts must examine a child's need for stability, and therefore, consider prior custody arrangements, including the duration of those arrangements, and the potential harm to the child if the arrangement is changed."). Existing arrangements in which the child has thrived should be disturbed only if the court finds compelling circumstances. *See Elmer,* 776 P.2d at 604.

¶ 27 However, not all continuity is alike. A heavy emphasis on preserving stability presupposes that the prior arrangement is not only satisfactory, but will in fact continue. As the trial court recognized in this case, there are variations in the degree of continuity that can be afforded. When maintaining one parent's primary physical custody will not truly preserve stability and continuity in the child's life, the court may find less compelling circumstances are sufficient to modify the custody order. In this case, Hudema diminished the extent of possible continuity, and thus the weight properly to be accorded this factor, when she changed the interpersonal dynamics of her household by remarrying and by moving from Jackson's lifelong Layton home to a new home in another state. *See Larson v. Larson,* 888 P.2d 719, 723 n. 4 (Utah Ct.App.1994) ("To an extent, of course, uprooting children from their present schools and neighborhood and moving them to a different state is inimical to continuity in their lives."). Consequently, as the court recognized, although the interest in stability still favored Hudema's retention of custody, it did not present such a high hurdle that, in light of the remaining factors, the court necessarily abused its discretion by modifying the custody order.

¶ 28 Hudema also argues the trial court abused its discretion in concluding the individual factors of religious compatibility and moral character favored awarding Carpenter custody. We agree. On the facts here, *religious compatibility* and *moral character* stand only at the "possibly relevant" end of the spectrum and, indeed, border on irrelevant. As such, the trial court exceeded the bounds of sound discretion in concluding these factors favored changing custody.

¶ 29 We previously made clear that only to the extent a parent's religious beliefs and practices motivate actions that negatively impact the child's welfare may a court inquire into religious compatibility. *See Larson,* 888 P.2d at 724. Otherwise, "the compatibility of a parent's and child's religious *beliefs* is not a matter that the court should consider." *Id.* (emphasis in original).[8] Thus,

(E) factors relating to the prospective custodians' character or status or their capacity or willingness to function as parents, including:
   (i) moral character and emotional stability;
   (ii) duration and depth of desire for custody;
   (iii) ability to provide personal rather than surrogate care;
   (iv) significant impairment of ability to function as a parent through drug abuse, excessive drinking or other causes;
   (v) reasons for having relinquished custody in the past;
   (vi) religious compatibility with the child;
   (vii) kinship, including in extraordinary circumstances stepparent status;
   (viii) financial condition; and
   (ix) evidence of abuse of the subject child, another child, or spouse; and
(F) any other factors deemed important by the evaluator, the parties, or the court.
Utah Code Jud. Admin. R4–903(3).

8. We recognize that in *Tucker,* our Supreme Court briefly noted that the evidence supported the trial court's finding of greater religious compatibility of the child with the father than the mother because the father was a more active

only when the parents' religiously based actions, either in their own right or by conflicting with the child's religious identity, negatively impact the child, as by compromising his health or safety, or by interfering with the stability and continuity in his life, or by diminishing the child's self image, should the religious compatibility factor be used to favor custody by one parent over the other.

¶ 30 A parent's religious practice may endanger the child's welfare if, for example, the child is a hemophiliac and the parent prohibits the child's access to necessary blood transfusions on religious grounds. *See, e.g., Levitsky v. Levitsky,* 231 Md. 388, 190 A.2d 621, 623, 627 (1963) (ordering custody decree amended to remove Jehovah's Witness mother's power to refuse children's blood transfusions where mother insisted she would refuse future transfusions for all her children " 'even if the result of her action was swift and sudden death' ") (citation omitted).

¶ 31 Alternatively, the parent's beliefs could conflict with the child's religious identity and disrupt the continuity in the child's life if, for example, the child identified himself as LDS, but the parent was a militant atheist and either prevented the child from participating in religious services, activities, and traditions, or demeaned the child for his religious beliefs. Thus, in *Kendall v. Kendall,* 426 Mass. 238, 687 N.E.2d 1228 (1997), *cert. denied,* 524 U.S. 953, 118 S.Ct. 2369, 141 L.Ed.2d 737 (1998), the court affirmed a custody order that restricted the father's ability to expose his children, who were Orthodox Jews, to his newly adopted religion which taught "that those who do not accept the Boston Church of Christ faith are 'damned to go to hell' where there will be 'weeping and gnashing of teeth,' " and where the father demonstrated his hostility to the children's religion by, *inter alia,* threatening to remove

his son's tzitzitz (clothing fringes) and cutting off his son's payes (side burns). *See* 687 N.E.2d at 1230 & n. 5, 1233–34. *See also Leppert v. Leppert,* 519 N.W.2d 287, 290–91 (N.D.1994) (reversing order granting mother custody where her "parenting, because of her beliefs, constituted an extreme danger to the children, both physically and emotionally").

¶ 32 The trial court's findings do not suggest that Hudema's religious beliefs or practices result in actions that are detrimental to Jackson's welfare. Further, the findings show no conduct by Hudema demonstrating hostility to Jackson's religious beliefs or otherwise negatively impacting Jackson. Rather, the court found that Hudema, like Carpenter, is LDS and that Hudema encouraged Jackson's religious participation, but that, when compared with Carpenter, she was not as active a participant. Concluding that these findings favor awarding custody to Carpenter is tantamount to awarding custody to the "better Mormon" and is clearly not permissible. *See Larson,* 888 P.2d at 724–25 (holding religious compatibility was not factor supporting change of custody where evidence did not show mother was likely to inhibit children from continuing religious training). So long as Hudema allows Jackson to pursue training in the religion with which he identifies and does not otherwise act to his detriment, Hudema is free to exercise whatever level of religious involvement—including no involvement—she wishes, or even to practice a wholly different religion. To hold otherwise and allow trial courts to deprive a parent of custody based on personal religious decisions, without any showing of a negative impact on the child's welfare, would raise serious constitutional questions. *See* U.S. Const. amend. I; Utah Const. art. I, § 4.[9] Accordingly, in our review of the

---

participant in the common religion. *See* 910 P.2d at 1217. However, the *Tucker* court merely addressed whether the evidence supported the court's finding; it did not address the issue here and in *Larson* of whether—assuming it is supported by the evidence—religious compatibility without any finding or evidence of a negative impact on the child's interests can favor custody by one parent over another. *See Larson,* 888 P.2d at 723–25.

9. Section 4 of our Declaration of Rights provides in part:

The rights of conscience shall never be infringed. The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. There shall be no union of

court's ultimate conclusion awarding custody to Carpenter, we disregard its finding that Carpenter had heightened religious compatibility with Jackson.

¶ 33 Likewise, on the facts of this case, Hudema's move to Arizona six weeks before her marriage to her current husband had no impact on Jackson's best interests. Accordingly, the trial court exceeded its discretion in concluding that a comparison of Hudema's and Carpenter's moral character favored awarding Carpenter custody of Jackson. " 'Moral standards' are a statutory consideration, Utah Code Ann. § 30–3–10 (1989), and may be relevant to a custody determination *to the extent they affect the children's best interests." Roberts v. Roberts,* 835 P.2d 193, 197 (Utah Ct.App.1992) (emphasis added). *See* Utah Code Ann. § 30–3–10(1) (Supp.1999).

¶ 34 In this case, the trial court found that Hudema moved in with her current husband six weeks before their wedding and that this "demonstrates a lack of moral example." [10] However, assuming this finding was based upon a solid evidentiary foundation, the court made no finding that this six week period had any negative impact on Jackson. Rather, the evidence indicated Jackson was not exposed to any sexual behavior during this time and, at five years old, was not old enough to understand adult sexual relationships. Moreover, from Jackson's point of view, there would have been little difference in home life between this six-week period and the time after the wedding.

¶ 35 Further, pragmatic considerations associated with moving hundreds of miles, planning a wedding in another state, and finding suitable housing for such a short time mitigate against finding that this brief period of premarital cohabitation demonstrates any flaw in Hudema's character. By moving directly into her new home immediately upon arriving in Arizona six weeks before the wedding, Hudema may have minimized disruption to Jackson by reducing the number of moves to be made and/or the number of necessary trips between the two states, as well as the stress associated with planning the wedding.[11] Accordingly, because the court did not find, and we see no other evidence indicating, that this short period of cohabitation had any negative impact on Jackson's welfare, we conclude the trial court exceeded its discretion by determining that a comparison of moral character favored awarding custody to Carpenter. Hence, as with religious compatibility, we disregard this factor in our review.

¶ 36 The trial court also concluded that the interest in promoting Jackson's kinship ties favored awarding Carpenter custody. The court was within its discretion in so concluding given that Hudema had no extended family residing in Arizona but both Carpenter and Hudema had relatives in Southern Utah and Jackson's half-sister, Shelby, resided with Carpenter. Although this favors awarding custody to Carpenter, this factor is at the less significant end of the spectrum. When compared to the need for maintaining stability, this factor alone is relatively unimportant and cannot override the interest in preserving stability.

¶ 37 In contrast, the child's bond with a particular parent is at the significant end of the spectrum and thus should weigh heavily in the court's determination. Indeed, when the court finds that the child has bonded more closely with one parent than another, the court is within its discretion in concluding that the difference in bonding overrides the general interest in stability, es-

Church and State, nor shall any church dominate the State or interfere with its functions. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment.
Utah Const. art. I, § 4.

10. We note that such a finding contradicts the assessment of the custody evaluator, Margaret Chapman, whose report, otherwise relied upon by the court, stated, "The moral character and emotional stability of both natural parents, and both step-parents is sound, and without question."

11. This was not the situation in *Tucker,* where the mother cohabited with another person in the presence of the child *before* she divorced her husband. *See* 910 P.2d at 1218.

pecially where the prospect of stability is diminished.[12]

■ ¶ 38 In this case, the court heard testimony from Margaret Chapman and V. Gerald Thamert, another licensed social worker, both of whom concluded that Jackson was more closely bonded with his father and recommended the court award custody to Carpenter. The trial court, as fact-finder and sole judge of witness credibility, agreed, found the recommendations supported by the evidence, and ruled that Jackson's interests would be best served by awarding custody to Carpenter. In this admittedly close case in which the court had to choose between two good parents, and where continuity has been compromised and the need to preserve it thus diminished, we must defer to the trial court's broad discretion and affirm its conclusion that Jackson's interests would best be served by awarding Carpenter primary physical custody. Basically, we affirm because the court did not abuse its discretion in concluding that Jackson's closer bond with his father outweighs the interest in preserving the existing custodial arrangement where that arrangement offers less continuity than is usually the case.

## CUSTODY EVALUATION REPORT

¶ 39 Hudema next argues the trial court erred in denying her motion for new trial, which requested the court to consider new evidence relevant to custody. Her motion contended Margaret Chapman's child custody evaluation was procedurally unfair and biased in Carpenter's favor.

To succeed on such a motion, a party must establish: (1) the existence of newly discovered evidence which is material and competent; (2) that by due diligence the evidence could not have been discovered

and produced before trial; and (3) that the evidence is not merely cumulative or incidental, but is substantial enough that with the evidence there is a reasonable likelihood of a different result.

*ProMax Dev. Corp. v. Mattson,* 943 P.2d 247, 253 (Utah Ct.App.), *cert. denied,* 953 P.2d 449 (Utah 1997).

■ ¶ 40 In ruling on her motion, the trial court found that the evidence offered by Hudema could have been produced at trial with reasonable diligence, the custody evaluation was not flawed, and no additional evaluation was necessary. Hudema disputes this ruling, arguing that Chapman's custody evaluation was flawed and unfair because Chapman had more opportunity to view Jackson when in Carpenter's care; she was biased in favor of Carpenter, as exhibited by two meetings with Carpenter and his counsel; she received more letters of recommendation on Carpenter's behalf; she performed no psychological tests on Jackson; and she failed to accord enough weight to the interest in continuing a custody arrangement where Jackson was happy and well adjusted.

¶ 41 We first note that Chapman's evaluation complies with the requirements of Rule 4–903, Utah Code of Judicial Administration, and was therefore admissible.[13] *See Merriam v. Merriam,* 799 P.2d 1172, 1175 (Utah Ct.App.1990). Regarding her allegedly new evidence concerning the evaluation, Hudema has failed to demonstrate that such evidence could not have been produced or discovered at trial in the exercise of due diligence. Chapman submitted her report to the court and Hudema more than three months before trial. If Hudema believed the evaluation was fundamentally flawed or additional evidence was required for the court to properly assess any flaws or biases in the evaluation, she had ample time to produce such evidence or re-

---

12. It is perhaps an unusual case where the child forms a closer bond with the noncustodial parent. Nonetheless, the court here found Jackson had a closer bond with Carpenter and such bond is not altogether surprising given the extensive time Carpenter spent with Jackson—i.e., Carpenter actively participated in Jackson's care before and after the divorce while living in Layton and Jackson visited Carpenter in his home for up to fifteen days per month after Carpenter moved to Brian Head.

13. It is inconsequential that Chapman, a licensed social worker rather than a licensed psychologist, performed the evaluation because, as Hudema acknowledges, this was not a psychological evaluation. *See* Utah R. Jud. Admin. 4–903(1)(A) ("Social work evaluations shall be performed by social workers licensed by the state in which they practice.").

quest a continuance. We therefore conclude the trial court did not abuse its discretion in denying her motion for new trial.

## ATTORNEY FEES

¶ 42 Finally, Hudema asserts the trial court erred in awarding attorney fees incurred by Carpenter in responding to the affidavits and exhibits submitted with her post-trial motions and ultimately stricken by the trial court. Rule 11 authorizes the court to impose fees when, *inter alia*, a motion's "contentions therein are [not] warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Utah R. Civ. P. 11(b)(2). Here the court ruled that an award of fees was warranted because "petitioner's affidavits, letters and exhibits submitted in support of [her post-trial] motions were inappropriate, as an attempt by petitioner to place evidence before the Court that counsel for petitioner well knew or should have known could have been raised at trial." We agree.

¶ 43 As discussed above, a party may move for a new trial under Rule 59 on the grounds of newly discovered evidence. However, both below and on appeal, Hudema has made no showing that "by due diligence the evidence could not have been discovered and produced before trial." *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 253 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1997). There is nothing inherently wrong with filing nonfrivolous post-trial motions, even if they are ultimately unsuccessful. However, submission of voluminous affidavits containing testimony that could easily have been introduced at trial is simply not authorized by existing law as stated in Rule 59. Consequently, we do not disturb the trial court's conclusion that an award of attorney fees was appropriate.[14]

14. We deny Carpenter's request for attorney fees on appeal under Rules 33 and 24, Utah Rules of Appellate Procedure. Hudema's appeal was not frivolous and her brief complied with applicable requirements. *See Taylor v. Hansen*, 958 P.2d

## CONCLUSION

¶ 44 We conclude the trial court did not err in ruling that there was a sufficient change of circumstances to warrant modifying the divorce decree. However, the court exceeded its discretion in concluding that religious compatibility and a comparison of moral character favored awarding custody to Carpenter. Nonetheless, it was within the court's discretion to rule that Jackson's interests would best be served by awarding custody to Carpenter because Jackson's stronger bond with his father and the increased kinship ties in southern Utah outweighed the interest in continuing the existing custody arrangement, especially since continuing Hudema's custody would do less to preserve overall stability in Jackson's life than is usual. Further, the trial court correctly denied Hudema's motion for a new trial to allow evidence of the custody evaluation's flaws because such evidence could have been presented at trial. Finally, we affirm the trial court's decision to award attorney fees under Rule 11 for filing voluminous post-trial affidavits and exhibits not authorized by existing law.

¶ 45 Affirmed.

¶ 46 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge, and JUDITH M. BILLINGS, Judge.

923, 931 (Utah Ct.App.1998) ("[W]e impose such sanctions only in egregious cases, 'lest there be an improper chilling of the right to appeal erroneous lower court decisions.'") (citation omitted).