2009 UT App 365

**Chad Jason HANSON, Petitioner and Appellee,**

v.

**Allison Sara HANSON, Respondent and Appellant.**

No. 20070575–CA.

Court of Appeals of Utah.

Dec. 10, 2009.

Scott L. Wiggins, Salt Lake City, for Appellant.

Bradley G. Nykamp, Salt Lake City, for Appellee.

Before GREENWOOD, P.J., BENCH and DAVIS, JJ.

## MEMORANDUM DECISION

BENCH, Judge:

¶ 1 Allison Sara Hanson (Mother) appeals the trial court's modification of a custody agreement granting custody of the children to Chad Jason Hanson (Father) if Mother refused to move back to Utah from Louisiana and reside "within a reasonable distance ... of [Father's] present residence." Mother specifically challenges the trial court's determination that modification of the custody agreement was in the children's best interests.[1] We affirm.

In determining whether custody modification is in a child's best interests, courts may consider a variety of factors with the weight given to each factor "rang[ing] from the possibly relevant to the critically important." *Hudema v. Carpenter*, 1999 UT App 290, ¶ 26, 989 P.2d 491. *See generally* Utah Code Ann. § 30–3–10.4 (Supp.2009) (stating the statutory guidelines for custody modification and incorporating sections 30–3–10 and 30–3–10.2(2) for factors the court must consider in determining the best interests of the child). "At the critically important end of the spectrum ... lies continuity of placement ... [with the child's primary caregiver, which] should be disturbed only if the court finds compelling circumstances." *Hudema*, 1999 UT App 290, ¶ 26, 989 P.2d 491 (citing *Elmer v. Elmer*, 776 P.2d 599, 604 (Utah 1989); *Davis v. Davis*, 749 P.2d 647, 648 (Utah 1988); *Paryzek v. Paryzek*, 776 P.2d 78, 82 (Utah Ct.App.1989)). Otherwise, "where a particular factor falls within the spectrum of relative importance" is within "the trial court's discretion ... based on the facts" of the case. *Id.*

---

1. "Before modifying a custody order, the court conducts a bifurcated inquiry to determine, first, if there has been a substantial and material change in the circumstances upon which the award was based, and, if so, whether a modification is in the best interests of the child." *Hudema v. Carpenter*, 1999 UT App 290, ¶ 22, 989 P.2d 491. Here, Mother does not challenge the trial court's conclusion that a material change had occurred, based primarily on the fact that Mother had moved from Utah to Louisiana—a move not contemplated at the time of the original custody agreement. Further, in cases that involve a stipulated, nonlitigated custody agreement, like we have here, the changed circumstances prong need not be "strictly and rigidly applied" and "should be viewed as a means of promoting the ultimate objective, the overall best interests of the child." *See Elmer v. Elmer*, 776 P.2d 599, 605, 604 (Utah 1989). Accordingly, we address only the best interests prong herein.

¶3 One compelling circumstance "relevant to . . . the child's best interests" is "interference with visitation." *See Smith v. Smith*, 793 P.2d 407, 411 (Utah Ct.App.1990); *see also Sigg v. Sigg*, 905 P.2d 908, 917 (Utah Ct.App.1995) (concluding that interference with visitation was an appropriate basis for custody modification). *See generally* Utah Code Ann. § 30–3–10(1)(a)(ii) (Supp.2009) ("In determining any form of custody, the court shall consider the best interests of the child and . . . which parent is most likely to act in the best interest of the child, including allowing the child frequent and continuing contact with the noncustodial parent."); *id.* § 30–3–10.2(2)(c) (2007) ("In determining . . . the best interest of a child . . . the court shall consider . . . whether each parent is capable of encouraging and accepting a positive relationship between the child and the other parent, including the sharing of love, affection, and contact between the child and the other parent."). "The best interests of a minor child are promoted by having the child respect and love *both* parents[, which includes f]ostering a child's relationship with the noncustodial parent. . . . Interference by the custodial parent with a noncustodial parent's visitation rights . . . may clearly be contrary to a child's best interests." *Smith*, 793 P.2d at 411 (citations and internal quotation marks omitted). In *Sigg v. Sigg*, 905 P.2d 908 (Utah Ct.App.1995), the children's mother had consistently interfered with the father's right to visitation with his children. *See id.* at 910–12. Although the mother had been the children's primary caregiver, the trial court modified the custody arrangement, giving custody to the father. *See id.* at 912. The trial court there found that the father would be more likely to facilitate visitation whereas the mother, as evidenced by her prior actions, would not. *See id.* This court concluded that the trial court was well within its broad discretion to modify the custody arrangement and "endorse[d] the trial court's goal of arranging custody in a way that fosters a relationship with both parents." *Id.* at 917.

¶4 Here, Mother argues that the trial court lacked a compelling reason for removing the children from their primary caregiver.[2] In so arguing, Mother mischaracterizes the trial court's decision as being based only upon the children's "close proximity to extended family in Utah" and infers that the court "believed the children's domicile in [Utah] is so essential to their welfare that not residing there would be more detrimental than separating them from their life-long primary caregiver." In support of her argument, Mother relies heavily on *Larson v. Larson*, 888 P.2d 719 (Utah Ct.App.1994). In *Larson*, this court reversed a trial court's custody modification, concluding that allowing children to remain in their life-long community and maintain a relationship with their extended family is insufficient justification for removing children from the custody of their primary caregiver. *See id.* at 722, 725–26. Notably, in *Larson* there was no evidence of interference with visitation; in fact, the custodial parent had "been extremely flexible in coordinating [the noncustodial parent's] visitation." *Id.* at 725. This case is therefore distinguishable from *Larson* because the trial court here, as in *Sigg*, "arrange[d] custody in a way that fosters a relationship with both parents." *See Sigg*, 905 P.2d at 917.

¶5 The trial court issued a thorough and detailed memorandum decision, wherein it made numerous findings.[3] Among those are

2. Mother had been the children's primary caregiver during the marriage and after the divorce. When Mother refused to relocate to Utah as required by the trial court's order, Father obtained custody of the children. Mother filed a timely notice of appeal following the trial court's custody modification order. Mother's counsel then filed multiple extensions, resulting in over a year-long delay—a particularly egregious delay considering the time-sensitive nature of a custody case. As a result, Father has been the children's primary caregiver since August 2007. Thus, even if we were to accept Mother's argument and remand to the trial court, the facts would have materially changed regarding which parent is the children's primary caregiver. *See generally Pusey v. Pusey*, 728 P.2d 117, 120 (Utah 1986) (concluding that a "[p]rominent" factor to consider "in competing child custody claims" is "the identity of the parent with whom the child has spent most of his or her time pending custody determination").

3. Mother does not challenge the trial court's factual findings.

the following findings as to how Mother had interfered with Father's visitation with his children:

14. [Mother] openly acknowledge[d] under oath ... that she has deprived [Father] of his visitation ... when in her mind [he] became unreasonable. Further, [Mother] admitted under oath that she has not given [Father] the visitation rights set forth in their Decree and she has not granted him visitation rights [as required by statute].

15. The Child Custody Evaluation notes that [Mother] has been somewhat obstructionistic about [Father] visiting with his children. [Mother] has made it difficult for [Father] to have his visitation....

16. [Mother] admits she has refused to pay the travel costs required of her in the Decree to permit [Father] to have his visitation/parent time. [Mother's] refusal/failure to comply with the Decree, which specifically ordered [Mother] to assume all costs of out-of-state visits, has occurred on more than one occasion.

17. At least one of the children reported [Mother] hanging up on [Father] when the children attempted to talk to him.

. . . .

19. [Mother] makes the children feel guilty about visiting [Father]. The children have reported that [Mother] "feels sad" about them ... visiting [Father].

20. [Mother] has eavesdropped in on conversations and telephone calls between [Father] and the children.

21. When [Father] has visitation with the children in Utah, [Mother] frequently calls or sends text messages to the minor children, including during the periods of what are to be uninterrupted visitation. In addition, sometimes as a condition of allowing [Father] to have visitation in the first place, [Mother] has required her parents (grandparents) to get visitation with the children prior to [Father] getting to exercise his visitation with the children.

. . . .

23. The Court finds the conduct by [Mother] has affected the relationship between [Father] and the children.

The trial court concluded that "whether conscious or not, [Mother] has used distance to diminish ... [the children's] relationship with ... [F]ather" and "will continue to use the realities of physical separation to subtly, but inexorably, impact [Father's] relationship with the children."

¶ 6 The trial court also found that Father would not interfere with visitation the way Mother had because he had not "denied or attempted to limit the[ ] calls and messages by [Mother] or her parents' visitation, ... demonstrat[ing] that he has not and would not hamper [Mother's] contact with the children." The trial court concluded that "[Father] will be better than [Mother] ... [at offering] the children meaningful relationships with both parents, grandparents and extended family[, including] their half-brother" and that "[Father] is the parent who is more likely to work to maintain a strong relationship with each parent."

¶ 7 The trial court determined that Mother had used her distance from Utah as a way of frustrating Father's visitation whereas Father would be "the parent most likely to allow frequent and continuing contact with the non-custodial parent." Accordingly, the trial court ordered that if Mother would return to Utah to more easily facilitate visitation, she could maintain custody; but if Mother refused to return to Utah, custody would then go to Father. In so ordering, the court indicated that if Mother would facilitate visitation, it would be in the children's best interests to remain with Mother. Yet the court also recognized that stability and continuity had to yield to the children's best interests of maintaining a relationship with Father and Mother. Thus, the trial court properly exercised its broad discretion "to arrange custody in a way that fosters a relationship with both parents." *See Sigg*, 905 P.2d at 917.

¶ 8 Accordingly, we affirm.[4]

¶ 9 I CONCUR: PAMELA T. GREENWOOD, Presiding Judge.

_____

4. We deny the parties' requests for attorney fees

as both have failed to state a "basis for such an

DAVIS, Judge (dissenting):

¶ 10 As the majority opinion correctly points out, Mother refused to relocate and, accordingly, Father has had custody of the children since August 2007. Thus, "the facts . . . have materially changed regarding which parent is the children's primary caregiver," *see supra* note 2, and reversal would have little, if any, effect on Mother's ability to obtain a change of custody. Moreover, I agree that Mother has failed to challenge the trial court's factual findings. Notwithstanding these considerations, I respectfully dissent.

¶ 11 In my view, the trial court's order requiring Mother to relocate or relinquish custody of the children sets bad precedent for two reasons. First, the trial court failed to give proper weight to Mother's long-term status as the children's primary caregiver. Second, there are other remedies available for visitation violations besides removing the children from the offending parent's custody. *See* 24A Am.Jur.2d *Divorce and Separation* § 897 (2008) ("The ordinary method of enforcing custody and visitation rights is a contempt proceeding."); *cf.* Utah Code Ann. § 30–3–10.9(9) (2007) ("Failure to comply with a provision of the parenting plan or a child support order may result in a finding of contempt of court."); *Kimball v. Kimball,* 2009 UT App 233, ¶ 29, 217 P.3d 733 (upholding trial court's determination that the wife was in contempt of court for failing to follow the court's visitation order).

¶ 12 In determining whether a change of custody is in a child's best interests, trial courts consider a variety of factors, and the weight to be given to these various factors "ranges from the possibly relevant to the critically important. At the *critically important* end of the spectrum, when the child is thriving, happy, and well-adjusted, lies continuity of placement." *Hudema v. Carpenter,* 1999 UT App 290, ¶ 26, 989 P.2d 491 (emphasis added). Indeed, "[i]n considering competing claims to custody between fit parents . . . *considerable weight* should be given to which parent has been the child's primary caregiver." *Davis v. Davis,* 749 P.2d 647,

648 (Utah 1988) (emphasis added); *see also Pusey v. Pusey,* 728 P.2d 117, 120 (Utah 1986) (stating that *decisive* factors in child custody determinations should include "the identity of the primary caretaker during the marriage"); *Paryzek v. Paryzek,* 776 P.2d 78, 82 (Utah Ct.App.1989) ("[I]n custody determinations, trial courts must examine a child's need for stability, and therefore, consider prior custody arrangements, including the duration of those arrangements, and the potential harm to the child if the arrangement is changed."). Accordingly, "a lengthy custody arrangement in which a child has thrived *ought rarely, if at all, to be disturbed,* and then only if the circumstances are compelling." *Elmer v. Elmer,* 776 P.2d 599, 604 (Utah 1989) (emphasis added).

¶ 13 Here, in considering the petition to modify the divorce decree, the trial court failed to give any weight, let alone considerable weight, *see Davis,* 749 P.2d at 648, to the fact that Mother had been the children's primary caretaker their entire lives—both during the marriage and following the divorce. Instead, the trial court focused exclusively on Mother's role as primary caregiver *after* the move to Louisiana: "[Mother] ha[s] been the 'children's primary care giver' and she appears to do a good job of meeting their basic needs. However, the Court does not put much weight on the determination that [Mother] is the primary care giver *because her being in Louisiana* necessitates this fact." (Emphasis added.) Rather than focusing only on the time in Louisiana, case law required the trial court to consider Mother's role as primary caregiver during the marriage, following the divorce, and during the pendency of the change of custody determination. *See Davis,* 749 P.2d at 648; *see also Pusey,* 728 P.2d at 120. The trial court's failure to do so, in my view, constitutes an abuse of its discretion.

¶ 14 Moreover, *Sigg v. Sigg,* 905 P.2d 908 (Utah Ct.App.1995)—the case relied upon by the majority for the proposition that interference with visitation is a compelling circumstance that outweighs the primary caregiver factor in determining a change of custody—is

award." *See* Utah R.App. P. 24(a)(9) ("A party seeking to recover attorney[ ] fees incurred on

appeal shall state the request explicitly and set forth the legal basis for such an award.").

distinguishable from this case in two important respects. First, in *Sigg* the mother obstructed the father's visitation with his children in *egregious* ways simply not present in this case.[1] *See id.* 905 P.2d at 910–11. Second, the child custody evaluator in *Sigg* "recommended, both in her report and during trial testimony, that it would be in *the best interests of the children to transfer custody to [the father].*" *Id.* (emphasis added). In contrast, the child custody evaluator in this case testified, "I would not remove the children from [Mother]. I'm opposed to that. So I'm not talking about leaving mom in Louisiana and having the kids come here. I do not support that." Because *Sigg* is distinguishable from the instant case, it has minimal application here. Rather, I believe *Larson v. Larson*, 888 P.2d 719 (Utah Ct.App. 1994), is more analytically appropriate to determine whether there were compelling circumstances that outweighed Mother's lengthy primary caregiver status.

¶ 15 In any event, there are other remedies available if one parent is obstructing the other parent's visitation in violation of the terms of the divorce decree. *See* Utah Code Ann. § 30–3–10.9(9); 24A Am.Jur.2d *Divorce and Separation* § 897. Under the facts of this case, forcing Mother to relocate or lose custody notwithstanding her lengthy primary caregiver status seems unnecessarily drastic.

¶ 16 For the foregoing reasons, I dissent.

---

**1.** For example, the mother moved with the children to New Zealand without ever informing the father of the move; in fact, the father had to eventually hire a private investigator to locate the children. *See Sigg v. Sigg*, 905 P.2d 908, 910–11 (Utah Ct.App.1995). Once in New Zealand, the children were only allowed to speak to their father once on the phone and subsequent phone calls with him "were thwarted." *Id.* at 911. Additionally, during a five-week stay in New Zealand to see the children, the father was allowed only one two-hour supervised visit and was otherwise prevented from seeing them. *See id.*